105 F.Supp.2d 294 (2000)
PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, Plaintiff,
v.
Mayor Rudolph GIULIANI, NYC 2000; New York City Department of Parks and Recreation; CowParade, LLC; CowParade Holdings Corp.; CowParade NYC 2000, Inc.; and Velocity Sports and Entertainment, LLC, Defendants.
No. 00 Civ. 3972(VM).
United States District Court, S.D. New York.
July 25, 2000.
*295 *296 *297 M. Christine Carty, Lisa M. Cobb, Schnader, Harrison, Segal & Lewis, L.L.P., New York, NY, Gordon A. Einhorn, Jennifer DuFault James, Schnader, Harrison, Segal & Lewis, L.L.P., Harrisburg, PA, for plaintiff.
Edward J. Nolan, Law Offices of Edward J. Nolan, Hackensack, NJ, for CowParade, LLC, CowParade Holdings Corp., CowParade NYC 2000, Inc., Velocity Sports & Entertainment, LLC, defendants.

OPINION AND ORDER
MARRERO, District Judge.
Plaintiff People for the Ethical Treatment of Animals, Inc. ("PETA") requests a preliminary injunction compelling defendants to display a design that PETA submitted for inclusion in a public art exhibit known as the CowParade. This event began in New York City on June 15, 2000 and is scheduled to end on September 3, 2000. The CowParade artwork is currently on display in various public open spaces throughout the City. PETA contends that by excluding one of PETA's proposed designs from the exhibit, defendants, a public-private partnership consisting of the City and the organizers of the CowParade, impermissibly infringed upon PETA's rights of expression in violation of the Federal and New York State Constitutions.
Courts are often called to rule upon novel concepts of words and deeds. This case presents a unique question: whether a cow is a forum or a forum a cow, and then when and where such a cow/forum may be found. Not surprisingly, any notion of first impression is bound to generate disputes arising from different understandings and applications of the unfamiliar concept. Any effort to resolve them is imbued with uncommon difficulties. In the realm of art and fanciful ideas, the challenge is perhaps compounded. The controversy here presents some weighty First Amendment questions. A full trial on the merits may not be possible before the CowParade ends. The disposition of PETA's motion for a preliminary injunction therefore is likely to resolve the most significant element of the controversy before the Court  the scope of PETA's right to display artwork as part of the CowParade.
The resolution of this case has been complicated and prolonged, not as much by any definitional questions related to the intended whimsy associated with the art exhibit, as by a number of substantial issues *298 presented here that are entangled in legal ambiguities or that fall within the interstices of First Amendment doctrine. These circumstances have required more than the ordinary amount of deliberation within less time than normally required to decide issues of significant moment, explaining the uncommon length of this opinion. Perhaps less constraint might have yielded more concision. To paraphrase Blaise Pascal and others, if the Court had had more time, it would have written a shorter opinion.[1]
Having fully considered that the disposition of PETA's request for a preliminary injunction potentially constitutes final relief in this action, the Court denies PETA's motion.

FACTS
PETA is a non-profit animal rights organization which claims more than seven hundred thousand members. It states that it is "dedicated to establishing and protecting the rights of all animals" and adheres to the philosophy that "animals are not ours to eat, wear, experiment on, or use for entertainment." Compl. ¶ 2. To this end, it aims "to provide public education in order to engender recognition of animal rights and ensure treatment of animals in accordance with animal rights." Id.
PETA brought suit against various public and private entities involved in organizing a public art event known as CowParade New York City 2000 (the "CowParade"), a joint public-private venture organized and presented by defendants. New York City Mayor Rudolph Giuliani (the "Mayor"), the New York City Department of Parks and Recreation and NYC 2000[2] (collectively, the "City") are the public co-hosts of the CowParade, having joined with the private entities CowParade, LLC, CowParade Holdings Corp., and CowParade NYC 2000, Inc. (collectively, with Velocity Sports and Entertainment, LLC, the "CowParade Organizers"). Defendant Velocity Sports and Entertainment, LLC was hired by the CowParade Organizers to oversee the planning and execution of the CowParade.
The CowParade itself, which began on June 15, 2000 and continues until September 3, 2000, is a public art exhibit now on display throughout New York City. Similar events have previously been sponsored in Zurich, Switzerland and Chicago by some of the CowParade Organizers. CowParade consists of approximately 500 life-size fiberglass sculptures of cows in three basic poses which have been painted, decorated or otherwise altered artistically. Individuals and groups, in particular "every corporation, restaurant, hotel and/or retailer in New York," were solicited by the CowParade Organizers to become "patrons," or sponsors, of CowParade by "adopting" a cow to be displayed as part of the event. See Declaration of Sean Gifford in Support of PETA's Motion for Preliminary Injunction, sworn to May 31, 2000 ("Gifford Decl."), Ex. A at 2. To become sponsors, interested groups or individuals were required to sign a sponsorship form and to pay $7,500 for each cow they sought to adopt, with a maximum of twenty-five cows per applicant. Sponsors could either select a design from among hundreds submitted to CowParade by independent artists or could themselves commission artists to design their cows, subject to the guidelines and approval process specified by the CowParade Organizers.
The approval process, though not set forth in the sponsorship agreement each *299 applicant had to submit, involved design acceptance by a committee comprised of individuals representing the City and CowParade Organizers (the "Committee"). The Committee reviewed each of the submitted designs to determine which, if any, were not appropriate for the CowParade.
The decorated cow sculptures, in accordance with the standards applied by the City and the CowParade Organizers, are presently located in a wide variety of highly visible public and private areas throughout the City, including parks, sidewalks, building plazas and train stations.[3] The City and CowParade Organizers have promoted CowParade as an important part of the City's millennial celebrations. According to a CowParade press release, Mayor Giuliani observed that the CowParade is a "unique public-private partnership" that "give[s] visitors and residents one more reason to explore the boroughs, while adding to New York City's creative, dynamic environment, and stimulating the economy." Gifford Decl., Ex. E. The financial benefit to the City and its businesses is emphasized strongly in CowParade's promotional materials, which point out that the CowParade in Chicago was "viewed by more than 10 million people and generated more than $500 million in additional tourism revenue." Id.
In addition to the indirect financial rewards the City expects from increased tourism and related revenue, it also anticipates a direct benefit by virtue of the agreement between the City, acting through the Commissioner of the Department of Parks and Recreation, and CowParade Worldwide, Inc. (the "Permit").[4]See City Decl., Ex. B at § 8. The Permit requires CowParade to remit to the City Parks Foundation, Inc. 10% of its gross receipts from the sale of CowParade merchandise. See id. at § 8(c). It also provides that the City will receive 50% of the gross proceeds from an auction of exhibited cows that will be held at the end of the event. See id. at § 9.
The Permit also specifies the terms by which the CowParade may use certain public spaces for the exhibit. The exhibition "shall consist of temporary installations of life-sized fiberglass cows, which may be installed individually or in clusters, at various sites throughout the five boroughs." Id. at § 1. More importantly, the Permit sets out some of the design and review requirements which the City imposed on the CowParade Organizers as a condition for granting the Permit.
In the section marked "Consultation and Cooperation," the Permit requires that
[t]he parties shall consult with each other during all stages of the planning of the Exhibition. It is understood and agreed that the Permittee will assemble a committee that will be comprised of representatives of the City, including [the Department of Parks and Recreation], as well as members of the New York City arts community. Such committee shall establish guidelines for submission of work for display in the Exhibition, and will evaluate artists' work in light of the submission guidelines. The Committee, in its discretion, may direct Permittee to remove any Exhibition component that includes material that is indecent or demonstrates a lack of proper respect for public morals or conduct.
Id. at § 1. The Guidelines and Approval Process for Commissioned Designs (the "Guidelines") specify, in relevant part, that
[t]he Commissioned Artist is encouraged to be creative with his or her Commissioned Design, but to remember that the audience will be broad-based and of all *300 ages. Commissioned Designs that are religious, political or sexual in nature will not be accepted....
Gifford Decl., Ex. G at ¶ 5. The Guidelines also specify that no corporate logos or advertisements would be permitted on the cows. See id. It is from an adverse decision of the Committee that PETA now seeks injunctive relief.
The contractual relationship between PETA and the CowParade Organizers began when PETA submitted a "CowParade New York 2000 Sponsorship Form" dated March 10, 2000 ("Sponsorship Form" or "Agreement"). See Gifford Decl., Ex. A. On it, PETA indicated to the CowParade Organizers its intention to sponsor two cows for a fee of $7,500 per cow. PETA also indicated on this form its desire to commission its own artist, rather than select from the portfolio of pre-designed cows. The Sponsorship Form describes the terms and conditions to which sponsors were required to agree before being permitted to adopt a cow in the CowParade. These terms specify that
[t]he location(s) in New York City where the cow(s) You adopt will be placed will be determined by Us [CowParade NYC 2000, Inc.]. If you commission any design for any of Your adopted cow(s), You agree to comply with the Guidelines and Approval Process for Commissioned Designs to be provided by Us.
Gifford Decl., Ex. A. They also include several provisions relating to ownership of the cows, such as an acknowledgment that the sponsor does "not own any right, title or interest in the name `CowParade' or any of the cow design(s);" that the adopted cows are owned by the CowParade Organizers; and that none of the proceeds from the auction of the cow after the event would be retained by the sponsor. Id. The terms of the Sponsorship Form also specify that all modifications and waivers must be in writing and that the Sponsorship Agreement would be governed by New York law. In a letter dated March 31, 2000, PETA was informed, in response to its request for a waiver, that as a nonprofit organization it would be allowed to retain 100% of the auction proceeds from the sale of each PETA cow. See Gifford Decl., Ex. B. The same letter also noted that the proposed cow designs were being reviewed by the Committee and that PETA would be notified within two weeks of the results.[5]
One of PETA's two proposed designs was approved by the Committee.[6] It consisted of a cow covered almost entirely with imitation leather products such as boots, belts, jackets, and a soccer ball, and bearing the words "buy fake for the COW'S sake." Gifford Decl., Ex. C. The second design, which was rejected by the Committee, divided the cow into sections in a manner intended to resemble a butcher shop chart showing the cuts of meat derived from a cow. Within each section was a statement or quotation "concerning the health and ethical problems associated with the killing of cows for food." Compl. ¶ 29; Gifford Decl., Ex. D. These statements and quotations were contained in nine panels:
Animal agriculture pollutes U.S. waterways more than all other industrial sources combined  Environmental Protection Agency

*301 "The cow is a poem of compassion ... to protect her is to protect all of creation."  Mohandas Gandhi
Vegetarians weigh, on average, 20 to 30 lbs less than meat-eaters.
Cattle are castrated and dehorned without anesthesia
"A lot of times the man skinning the cow finds out an animal is still conscious."  USDA Inspector Timothy Walker.
"Go Veggie!"  Sir Paul and Linda McCartney
Meat Eaters die from heart disease 3 times more frequently than vegetarians.-American Journal of Clinical Nutrition Steak is 87% fat. Eat it, and you will be too.
Eating meat causes impotence because it blocks the arteries to all vital organs, including the penis.  Dr. Dean Ornish, Medical Advisor to President Clinton
Compl., Ex. C; Gifford Decl, Ex. D.
In or about the week of April 15, 2000, PETA was informed by telephone that the Committee had rejected PETA's design for the second cow and was asked to redesign it in order for the cow to be included in the CowParade. See Affidavit of Jennifer Schumaker, submitted by the CowParade Organizers, sworn to June 21, 2000 ("Schumaker Aff."), at ¶ 4; City Decl., Ex. H. The Committee had found that while most of the statements included in the second cow were acceptable, three statements in three panels were not:
"A lot of times the man skinning the cow finds out an animal is still conscious."-USDA Inspector Timothy Walker.
Cattle are castrated and dehorned without anesthesia
Eating meat causes impotence because it blocks the arteries to all vital organs, including the penis.  Dr. Dean Ornish, Medical Advisor to President Clinton
The design review Committee consisted of David Chass (from Velocity Sports and Entertainment, LLC), Bud Konheim (representing NYC 2000), David Slarskey (Chief of Staff of the City's Parks Department), Pat Smith (representing the CowParade Organizers) and Dorrit Wohl (Deputy Commissioner of the City's Department of Cultural Affairs). See City Decl. at ¶ 10. The Committee convened one time, on April 9, 2000, to review the approximately 1,200 designs that had been submitted to CowParade. Each member of the Committee reviewed all of the designs independently, flagging those that raised concerns. See Affidavit of David Slarskey, attached to the City Decl., sworn to June 20, 2000 ("Slarskey Aff."), at ¶ 7. Only four were ultimately rejected.[7] From among all the approximately 1200 designs the Committee deemed acceptable, sponsor applications were ultimately accepted with respect to the approximately 500 sculptures now in the exhibit.
Slarskey averred that the PETA design was flagged by all of the members of the Committee:
We saw the design as inappropriate. We perceived it as overtly and aggressively political in that it was too graphic and violent for a public display that was to be installed in public parks, on public streets, and on school property, where the public at large of all ages would encounter it without having sought it out. We didn't reject the design merely because it compelled people to think. A discourse might have arisen from any number of whimsical designs. What troubled the committee was the provocative, graphic, offensive effect of the text chosen.
Id. at ¶ 14. The language found objectionable distinguished the second design from PETA's other submission, which was "whimsical, creative, and decorous in the manner of the majority of the other designs *302 submitted for consideration." Id. at ¶ 15. David Chass, another member of the Committee, attested that the Committee rejected the design for the reason that "[t]he other three panels were found to be inappropriate for the intended broad base of the audience, particularly children." Affidavit of David Chass, submitted by the CowParade Organizers, sworn to June 21, 2000 ("Chass Aff."), at ¶ 7. Chass also indicated that "at no time was there any discussion as to PETA itself, or its philosophy or message." Id. at ¶ 10.
There is some dispute between the parties as to what PETA was told about the rejection of the second design. PETA asserts that it was initially told that the design had been rejected as "graphic and profane" but was not informed of any specific guidelines which the design violated. Gifford Decl. at ¶ 8. PETA also claims to have been told that the minutes of the meeting at which the decision was made indicated that the design was rejected as "inappropriate." Compl. ¶ 32. Jennifer Schumaker, who delivered the Committee's decision rejecting three panels within the cow design to PETA, attested that she merely said they were inappropriate, without characterizing the decision because she had not been present at the meeting. See "Schumaker Aff" at ¶¶ 5, 6. PETA objected to the Committee's decision, and informed the CowParade Organizers in a letter dated April 20, 2000 that "the content of the slogans that the committee has deemed to be `graphic and profane,' is intended to be candid and eye opening and does not sink to the level of the obscene" and that its cow "will vividly confront the viewing public with the truth about animal cruelty in the meat industry." City Decl., Ex. H.
The CowParade Organizers contend that the words "graphic and profane" were never used; that the transcript was not referenced; and that PETA was told that it could resubmit a modified design. See Schumaker Aff. at ¶ 6. Defendants further contend that PETA was informed that the decision would not change and was provided with assistance in locating artists to paint the approved and the anticipated revised design, and that PETA repeatedly reaffirmed its intent to submit a modified design. Id. at ¶¶ 7-9. Whether or not PETA had intended to resubmit a modified design, a letter from PETA's attorney to the CowParade Organizers dated May 18, 2000 indicated that PETA had reconsidered and determined that no alternative design was acceptable and requested CowParade to reverse its decision. See City Decl., Ex. I. The CowParade Organizers did not reverse their decision, and the present action was commenced on May 25, 2000, when PETA filed its complaint with the Court. Oral argument was heard on June 29, 2000.
PETA's complaint alleges that defendants violated 42 U.S.C. § 1983 and PETA's free speech rights under the First and Fourteenth Amendments of the United States Constitution and under Article I, Section 8 of the New York State Constitution. On these claims, PETA seeks declaratory and injunctive relief and damages. PETA further claims that CowParade NYC 2000 breached its agreement with PETA by not allowing it to display both cows and that the breach should be remedied by specific performance and damages.

STANDARD OF REVIEW ON INJUNCTION
As an initial matter, the Court must resolve the disagreement between the parties as to the nature of the injunction PETA seeks. PETA claims that its requested injunction to preclude defendants from denying PETA access to the exhibit is "prohibitory" in nature, while the City and CowParade Organizers claim that PETA is seeking a "mandatory" injunction.
A preliminary injunction, ordinarily deemed prohibitory when it is sought to maintain the status quo ante pending a full hearing on the merits, may be granted if the movant establishes both "irreparable harm and either (a) a likelihood *303 of success on the merits or (b) a sufficiently serious question going to the merits, with a balance of hardships tipping in favor of the party requesting the preliminary injunction." Tunick v. Safir, 209 F.3d 67, 70 (2d Cir.2000). A higher standard applies, however, if the requested injunction is "mandatory," altering rather than maintaining the status quo, or if the injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if defendant prevails at a trial on the merits. See id.; Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 34 (2d Cir. 1995). In that event, the injunction may issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." Tom Doherty, 60 F.3d at 34 (citations omitted). See also New York Magazine v. Metropolitan Transit Auth., 136 F.3d 123, 127 (2d Cir.1998) (requiring a movant for a mandatory injunction to show not only a likelihood but a "clear" or "substantial" likelihood of success on the merits).
PETA argues that the status quo should be read as that set forth in the Sponsorship Agreement, meaning that PETA's second cow should be accepted and thus displayed. However, to find that the status quo represents the interpretation of one party to the very agreement contested in this litigation is to decide the merits of the contract claim. That view also ignores the reality of the situation. The status quo reflects conditions as they actually are. This reality is that PETA's second cow design was denied by the Committee and is not being displayed, the decision and actual condition PETA seeks an injunction to reverse. In PETA's view, the injunction it seeks essentially would direct defendants to stop prohibiting the PETA cow from being displayed. "Stop prohibiting" is but a semantic reverse side of the same coinage as "start permitting." Thus, an order to enjoin defendants from prohibiting PETA's display is still a mandatory order compelling them to exhibit the rejected design.
The Court finds that the reality of the status quo demands that PETA's application be considered to constitute a request for a mandatory injunction. Therefore, in order to obtain a preliminary injunction, PETA must show (1) that it will suffer some irreparable harm if the injunction does not issue and (2) either a clear or substantial likelihood of success on the merits, or extreme or very serious damage absent the preliminary relief. See Tunick, 209 F.3d at 70; Tom Doherty, 60 F.3d at 34.

IRREPARABLE HARM
As discussed below, the claims PETA asserts implicate its First Amendment rights. The Second Circuit reaffirmed recently that, "[b]ecause First Amendment rights are presumed irreparable," Tunick, 209 F.3d at 70 (citing Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547, (1976)), allegations directly implicating these rights, by their "very nature," satisfy the irreparable injury requirement for a preliminary injunction. Id.

LIKELIHOOD OF SUCCESS ON THE MERITS
The Court turns directly to the second prong of the required showing for a mandatory preliminary injunction: the movant's substantial likelihood of success on the merits. To assess the prospects that PETA eventually may prevail in this action, the Court must evaluate the claims in light of applicable First Amendment doctrine. This task entails a review of the relevant property to which PETA seeks access for its cow design, the relevant forum and purposes for which the government opened access to its property for expressive activities, and the standard of review appropriate for the relevant forum.

*304 APPLICABILITY OF FIRST AMENDMENT

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law and (2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States. 42 U.S.C. § 1983 (2000); West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Here, PETA claims that it was deprived of its rights under the Free Expression Clause of the First Amendment of the United States Constitution, as applied to the States by the Fourteenth Amendment.
Two threshold issues must be resolved in connection with the relief PETA seeks. These are whether the CowParade exhibit entailed speech protected by the First Amendment and whether the alleged violations resulted from state action. The parties do not contest either of these issues, and the Court determines that both prerequisites have been adequately demonstrated. By its very nature, the CowParade is an exhibit of art, a quintessential form of expression. Artistic expression, whether written or visual, is clearly protected by the First Amendment. See Bery v. City of New York, 97 F.3d 689, 696 (2d Cir.1996) (stating that paintings and sculptures are entitled to "full First Amendment protection"). As PETA's CowParade design consisted of protected speech, the rejection of PETA's proposal in essence could constitute a content-based restriction on the right of free expression actionable under 42 U.S.C. § 1983 if carried out under color of state law.
Defendants here comprise the City of New York and the CowParade Organizers acting in a public-private partnership to carry out the exhibit. For the purposes of stating a claim under 42 U.S.C. § 1983, private defendants' actions may be attributed to the state where private and public entities engage in a "symbiotic relationship" through which the alleged constitutional violation is carried out. See Burton v. Wilmington Parking Auth., 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)(where "[t]he State has so far insinuated itself into a position of interdependence with [a private entity] ... it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been ... purely private...."). Here, the City and the private CowParade Organizers concede that they formed a public-private partnership that gave rise to such a symbiotic relationship. See City Defendant's Memorandum of Law in Opposition to PETA's Motion for a Preliminary Injunction, dated June 22, 2000 ("City Memo") at 3. The contractual agreement between the City and the CowParade Organizers, coupled with the significant regulation and control over the event that was exercised by the City, created a sufficient link between the public and private entities, placing the CowParade activities under the umbrella of state action sufficient to satisfy the requirements of 42 U.S.C. § 1983.

THE FORUM
At its core, the controversy before this Court involves a conflict between, on the one hand, PETA's right to engage in protected speech in public spaces and, on the other, the scope of the government's authority to infringe upon freedom of expression as a direct or incidental effect of managing its affairs involving the use of public properties for their intended purposes. As a starting point for resolving such fundamental disputes, the United States Supreme Court has formulated an approach grounded on First Amendment forum analysis. See Perry Educ. Ass'n v. Perry Local Educ. Ass'n, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). The approach encompasses a judicial inquiry to determine the relevant forum, public property and government purposes associated with the alleged violation of free speech. The classification of the forum identifies the applicable *305 standard of judicial scrutiny the state action must satisfy for the Court to sustain a restriction on protected expression. Central to the forum doctrine is that both the "existence of a right of access to public property and the standard by which limitations upon such right must be evaluated differ depending on the character of the property at issue." Perry, 460 U.S. at 44, 103 S.Ct. 948.
The relevant forum and the accompanying level of review are intensely contested in this action. The outcome of the case turns on this determination. In examining pertinent case law, however, this Court encountered substantial ambiguities related both to forum designation and the attendant degree of scrutiny, concluding that the disposition of this case requires a resolution of these uncertainties. Because the matter is so pivotal to the ultimate result here, the Court finds it necessary, as the basis for a properly grounded decision, to review extensively the treatment of the public forum doctrine by both the Supreme Court and the Second Circuit.

Supreme Court Public Forum Doctrine
In Perry, the Supreme Court identified and defined three distinct types of forums. The first is the "quintessential public forum." Id. at 45, 103 S.Ct. 948. A traditional public forum encompasses "places which by long tradition or government flat have been devoted to assembly and debate," such as streets and parks to which general public access for expressive activities historically has been available and recognized. Id. In public forums so classified, the government may enforce content-based exclusions and promulgate content-neutral time, place and manner regulations of speech if it demonstrates that the limitation is "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Id.
At the other end of the spectrum is the category known as "nonpublic forum," which consists of public property that is neither by tradition nor purposeful government designation a forum for public discourse or debate. See id. at 46, 103 S.Ct. 948. The government may reserve a nonpublic forum for its intended purposes, "communicative or otherwise," as long as the regulation on speech "is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." Id. at 46, 103 S.Ct. 948 (citing United States Postal Serv. v. Greenburgh Civic Ass'n, 453 U.S. 114, 131, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981)).
In between these types of forums, Perry further identifies a variety that comprises "public property which the state has opened for use by the public as a place for expressive activity." Id. at 45, 103 S.Ct. 948. Although a government is not obliged to retain the open character of property indefinitely, so long as it does so, any content-based restriction must satisfy the same compelling governmental interest test that also applies to a traditional public forum. See id. at 46, 103 S.Ct. 948. In a footnote further elaborating and illustrating this category, the Court declared that a public forum can be created either for a limited purpose, such as use by particular groups, or for the discussion of certain subjects. See id. at 46 n. 7, 103 S.Ct. 948. Offering a specific example, the Court assumed that by granting access to charitable organizations a school district "has created a `limited' forum" extending only to other entities of a similar character. Id. at 48, 103 S.Ct. 948.
The middle concept of the "designated" or "limited" public forum has engendered the ambiguities and resulting doubts this Court has encountered in applying the doctrine and determining the relevant forum to resolve the case at hand. The uncertainties arise because in Perry, in describing this intermediate category that lies between a traditional public forum and the nonpublic forum, the Supreme Court does not specifically label the classification as a "designated" or a "limited" forum as such, although in defining and referring solely to this type of forum the Court does indicate explicitly that the category is a species of public forum that *306 arises by government "designation" and that may be created "for a limited purpose." Id. at 46 n. 7, 103 S.Ct. 948.
Two years after Perry, the Supreme Court confirmed its articulation of the public and nonpublic forums as previously defined, as well as the respective standard of judicial review. See Cornelius, 473 U.S. at 799, 105 S.Ct. 3439. Regarding the intermediate category of forums, the Court, still without explicitly naming it as a "limited public forum", expanded on the definition. Elevating the footnoted example from Perry to the body of its opinion, the Cornelius Court underscored that this forum comes about by intentional "government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." Id. at 802, 105 S.Ct. 3439. However, the Court also reaffirmed that the strict scrutiny test applies to these intentionally designated forums, thereby requiring a showing of a compelling governmental interest as the basis for exclusion. Id. at 800, 105 S.Ct. 3439.
In both Perry and Cornelius, the Supreme Court held that the forums in dispute were nonpublic. It therefore did not have the occasion there to label or apply its forum analysis to its concept of the public forum by designation. In a case predating Perry and Cornelius, however, and one of the few cases considered by the Court where a forum of the intermediate category was actually found, the Court determined that an annual state fair open to the general public that limited solicitation to rented booths constituted a "limited public forum." Heffron v. International Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 655, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). The Court sustained the limitation under a strict scrutiny standard. See id.[8]
In subsequent cases, the Supreme Court maintained its distinctions between public, designated and nonpublic forum classifications and the applicable judicial standard for each. In International Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992), the Court explicitly labeled the second variety as the "designated" public forum and for the first time acknowledged possible subsets of this category. The Court noted that a designated forum could be either "of a limited or unlimited character" and encompasses property that the state has opened for expressive activity "by part or all of the public." Id. at 678, 101 S.Ct. 2559 (emphasis added). But the Court did not elaborate on the distinction between the limited and unlimited subcategories and repeated its previous rule subjecting a designated public forum, whether limited or unlimited, to the same standard of review governing a traditional public forum. See id. at 678, 101 S.Ct. 2559; Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 392, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993).
As of Lee, therefore, the intermediate category of forum the Court described was variably referred to as "designated" or "limited," leaving beyond doubt that the Court had in mind only one main category, or at the very least a category and a subset of it. See Lee, 505 U.S. at 678-79, 112 S.Ct. 2701. Whatever the name, the Court's cases discussed above make two points clear: that the designated classification is a kind of public forum, and that it is subject to the same heightened level of scrutiny as the traditional public forum.
Yet, Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) introduces some uncertainty which has carried forward to the application of the public forum concept by the Second Circuit and thus *307 bears importantly in the case before this Court. The Rosenberger Court classified a public forum reserved for use by certain groups or for the discussion of certain topics as a "limited forum," consistent with the definition and nomenclature the Court previously had used to describe the intermediate category in the cases from Perry through Lee. See id. at 829, 115 S.Ct. 2510. The case has particular relevance because the Court's forum consideration suggests as its starting point that the forum the university created by its method of allocating student activities fees was a limited public forum. Of greater import, however, the Rosenberger Court explained: "[o]nce it has opened a limited forum ... [t]he State may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum nor may it discriminate against speech on the basis of its viewpoint." Id. at 829, 115 S.Ct. 2510 (emphasis added). This formulation of the pertinent degree of scrutiny describes the test the Court from Perry onward had adopted and applied to the nonpublic forum.
Thus, the Rosenberger Court applied a minimal standard of First Amendment review to content-based exclusion in the "limited" public forum it found, rather than the more stringent compelling state interest standard. To add to the complexity and to this Court's resulting doubts, it is worth noting that the Court in Rosenberger distinguished the "reasonableness" test, which it declared appropriate for content discrimination in a "limited forum," from viewpoint discrimination in a limited forum, for which it stated strict scrutiny applies. See id. at 829-30, 115 S.Ct. 2510. Moreover, in formulating its application of the reasonable test for a limited public forum, the Rosenberger Court cited Cornelius and Perry, although those cases set forth the "reasonableness" test as applicable only in regard to nonpublic forums. See id. at 829, 115 S.Ct. 2510; Cornelius, 473 U.S. at 802, 105 S.Ct. 3439; Perry, 460 U.S. at 46 n. 7, 103 S.Ct. 948.
A more recent Supreme Court articulation of these principles, however, reverted to the categories of speech forums established in Cornelius and Perry. See Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 678-79, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). Without reference to the distinction raised by Rosenberger, or indeed any mention of the case, the Court in Forbes referred to the intermediate category by name as a designated public forum and discussed at length both its attributes and its distinctions from a nonpublic forum. See id. at 678-79, 118 S.Ct. 1633. The Court identified as perhaps the most defining quality of a designated forum the government's intent to open the property "generally" to a class of speakers, stressing that the forum "is not created when the government allows selective access for individual speakers rather than general access for a class of speakers." Id. Summarizing the distinction, the Court stated that the government's intentional opening of "general access" to a certain class of speakers indicates a designated public forum, and that giving "selective access" to a particular class of speakers whose members must then individually "obtain permission" denotes a nonpublic forum. See id.

Second Circuit Cases
Taking note of the ambiguities described above, the Second Circuit stated in Fighting Finest, Inc. v. Bratton that "[t]he Supreme Court has sent somewhat mixed signals as to the criteria for identifying a `limited' public forum." 95 F.3d 224, 229 (2d Cir.1996).[9] As a consequence of this *308 uncertainty, the Circuit Court's application of the public forum doctrine may be subject to different interpretations. First articulated in Deeper Life Christian Fellowship, Inc. v. Board of Educ., 852 F.2d 676 (2d Cir.1988), the Second Circuit's formulation has reflected the "mixed signals" it traced to Perry and Cornelius. There, the Court of Appeals, referring to those cases, declared that "under the limited public forum analysis, property remains a nonpublic forum as to all unspecified uses, and exclusion of useseven if based on subject matter or the speaker's identityneed only be reasonable and viewpoint-neutral to pass constitutional muster." Id. at 679-80 (emphasis added) (citations omitted).
Citing Deeper Life, the Circuit Court elaborated on the concept of the limited public forum in Travis v. Owego-Apalachin Sch. Dist., 927 F.2d 688 (1991). The Travis court, after reciting the three categories of forums and the corresponding constitutional scrutiny standards described by the Supreme Court, declared that "we have identified a sub-category of the designated forum that we have styled the limited public forum'." Id. at 692 (emphasis added). The Court defined its concept of the limited forum as one created when government opens a nonpublic forum but limits expressive activity to certain kinds of speakers or the discussion of particular subjects. Id. The court then explained that, in a limited public forum, the government can "impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." Id. Although the court chose not to address whether the forum at issue before it was a "designated forum used for indiscriminate expressive activity by the public at large" or "only a limited forum", it concluded that even if the forum was of the limited variety, access to it could not be denied "absent a sufficient constitutional justification." Id. at 692-93. The court thus applied strict scrutiny review to hold that the school district had impermissibly excluded the expressive use in question. See id.; see also New York Magazine, 136 F.3d at 128 n. 2 (reaffirming the Circuit Court's reference to the limited forum as a sub-category of the designated public forum).
The Circuit Court's next major treatment of forum analysis occurred in Lebron v. National R.R. Passenger Corp., 69 F.3d 650 (2d Cir.1995). There, the Second Circuit was called upon to decide whether Amtrak's "Spectacular" commercial advertising sign at New York City's Penn Station constituted a public forum prohibiting the exclusion of a particular public issue message. See id. at 656. Rejecting Lebron's public forum argument, the court concluded that "most likely, [the sign] is a nonpublic forum, or perhaps it is a limited public forum opened for purely commercial speech." Id. In either event, the court stated that the minimal standard of review applied, upholding the exclusions of speech as long as they are "viewpoint-neutral and reasonable in relation to the forum's purpose." Id. The Lebron court grouped both nonpublic and limited public forums under the category of "not [being] a public forum." Id. However, the concept of the "limited" public forum as described by Supreme Court, other than in Rosenberger, consistently referred to this kind of forum synonymously with the designated forum, or as a type of public forum. Nonetheless, the Lebron court, citing Lee, also referred to designated public forums as either limited or unlimited. See id. at 655, 112 S.Ct. 2701. Lebron thereby left open numerous definitional questions. These conceptual conundrums include: whether there is only one version of the limited public forum or actually two, each a subgroup of the designated forum and of the nonpublic forum respectively; the difference between a designated public forum that is limited and one unlimited; the definition of a limited public forum that may be neither a designated public forum nor a nonpublic forum; the distinction between a limited forum that may be a sub-category of the designated forum and one that derives as a subset of the nonpublic forum.
*309 One year after Lebron, the Second Circuit, commenting on the mixed signals emanating from the Supreme Court's notion of the limited forum, effectively equated designated public forums with limited public forums, using the two terms interchangeably. See Bratton, 95 F.3d at 229. The court also held that the appropriate level of scrutiny in a designated/limited public forum can be either "necessary and compelling" or "reasonableness," depending on whether or not the excluded speaker falls within the purpose for which the forum was created. See id. "Where a speaker comes within that purpose, the State is generally subject to the same strict scrutiny that applies to traditional public forums.... Where the speaker does not come within that purpose, however, the State is subject to only minimal constitutional scrutiny." Id. (citation omitted).
The Circuit Court then decided Bronx Household v. Community Sch. Dist. No. 10, 127 F.3d 207 (2d Cir.1997). Reiterating the now familiar recitation of the Supreme Court's framework of three types of public forums, and citing Perry, Cornelius and Lee, the Court of Appeals referred to the designated public forum, "sometimes called the `limited public forum'." Id. at 211. Then, quoting Cornelius that limited public forums are "created by government designation" and applying the standard of review applicable to nonpublic forums, the Circuit Court declared that restrictions on access to limited public forums are permissible if the distinctions are reasonable and viewpoint neutral. See id. at 211-12.
Finally, in a very recent pronouncement regarding forum analysis, the Second Circuit once more equated "designated forums or limited public forums" as occupying the intermediate category, reaffirming both the definition and the standard of review applied to them in Bronx Household. See Good News Club v. Milford Cent. Sch. 202 F.3d 502, 504 (2d Cir.2000). Citing Rosenberger and Bronx Household, the Circuit Court expressly held that "restrictions on speech in a limited public forum will withstand First Amendment challenge if they are reasonable and viewpoint neutral." Id. at 509.
It appears therefore that the case law identifying the limited public forum has defined it as (1) a term synonymous and used interchangeably with a designated public forum; (2) a distinct subcategory of the designated forum; and (3) an outgrowth of a nonpublic forum. And the pertinent standard of First Amendment review has been applied either as strict scrutiny or as the minimal standard of reasonableness, or both. Where does this analysis lead, and what conclusions may a court draw from it when presented with a controversy whose resolution rests precisely on the application of these principles? To say that the ambiguities described have left this Court benumbed and bewildered is only modestly overstated.
A forecast of the likelihood of success on the merits of the dispute before this Court necessarily depends on clarification of the doubts the Court has described regarding what category of forum exists here and what standard of review applies to it. As a means of overcoming potential stasis so as to enable the Court to decide the case at hand, and to reconcile the apparent uncertainty which has been noted by at least one other court in this District,[10] this Court humbly offers a possible interpretation and an application of the forum doctrine that may achieve these ends. In light of the extensive treatment of the *310 distinction between the designated public forum and the nonpublic forum contained in Forbes, the limited forum classification styled by the Second Circuit as a "subcategory of the designated forum," see Travis, 927 F.2d at 692, may be more appropriately termed a variety of the nonpublic forum, i.e., one ordinarily closed to the general public but to which the government has opened access not "generally" but limited "selectively" to certain particular genres of expressive activities or speakers. See Forbes, 523 U.S. at 678-79, 118 S.Ct. 1633; Summum, 130 F.3d 906. This approach would maintain the symmetry between the forum classifications and better comport with the Supreme Court's most prevalent formulation. More importantly, it would explain why the lesser First Amendment scrutiny associated with nonpublic forums would apply to the version of "limited" public forum so defined, rather than the higher level of review that logically should apply if the limited forum were instead generically classified as a subset of the designated public forum, again reflecting the Supreme Court's more common articulation of the constitutional standard for the designated forum.
This reading, in fact, is consistent with the Second Circuit's own formulation in both Deeper Life and Travis. In the former, the Circuit Court stated that under limited public forum analysis "property remains nonpublic forum" as to all unspecified uses. Deeper Life, 852 F.2d at 679 (emphasis added). And in Travis, the court, elaborating on the derivation of the limited public forum, declared that the category is created when government "opens a nonpublic forum" but limits expressive activity to certain speakers or subjects. Travis, 927 F.2d at 692 (emphasis added). If this derivative forum conceptually traces its Second Circuit doctrinal origins to the opening of a nonpublic forum, arguably its classification and legal attributes should parallel those of the nonpublic rather than those of the designated forum: selective access to a particular segment of the public and the correspondingly lesser constitutional standard of review.
The parallel would work at the other end as well. The traditional public forum and the designated public forum, as most consistently articulated by the Supreme Court, have one aspect in common: both permit open access generally for "indiscriminate expressive activity by the public at large." Travis, 927 F.2d at 692. In the case of the traditional forum, the general public's right of access for expressive activities derives from the special status and historical role of the property and objective characteristics of the property itself "regardless of the government's intent." See Forbes, 523 U.S. at 678, 118 S.Ct. 1633. Regarding the designated forum, the speech right arises by virtue of purposeful government opening of property conferring such general access. Flowing from that shared element of larger public openness is the Court's application of the same standard of First Amendment scrutiny to any derogation of the more generally available right of access.
Similarly, the nonpublic forum and the limited public forum as here construed share a quality related to the nature of the public space and the government's intention in relation to public access for expressive purposes it permits on the property, from which follows the corresponding lower level of First Amendment review. As regards nonpublic forums, government property is either not generally accessible to members of the public because it is not suitable for such open access, or, pursuant to stated government policy or practice, it may be declared accessible only to a smaller, specifically defined segment of the public or limited to a particular class of speakers or subjects. To this extent, both instances entail the government retaining and exercising a greater measure of control over its internal operations with respect to the property in question, as well as curtailing the rights of access to expressive activities, not of the indiscriminate public at large, but of a selected smaller portion of it. Accordingly, consistent with the Supreme Court's public forum doctrine and associated distinctions, a lesser standard *311 of First Amendment scrutiny is justified.
For the purposes of resolving the dispute at hand, the Court will construe the Second Circuit's application of the limited forum concept in accordance with this Court's understanding of it as discussed above. Using this framework as a guide, the Court now proceeds to consider the relevant forum applicable here, examining first the divergent theories urged by the parties. PETA contends that the CowParade exhibit constitutes a public forum in and of itself because it is situated on traditional public properties used for expressive purposes. PETA also suggests that the forum must be defined by the public property to which PETA sought access  the sidewalks, parks and plazas designated by the City to contain the CowParade's artwork. In contrast, the City argues that the forum it created for the purposes of the CowParade is a limited public forum.

Traditional Public Forum
PETA argues that absent a compelling government interest, the City has no authority to transform traditional public property, like parks or sidewalks, for purposes of limited expressive activities such as those the CowParade entails, without allowing unrestricted access to every organization that wishes to participate. In other words, once the City chooses to locate an expressive event on traditional public spaces, it must open that event to all entrants on an equal basis and "must live with the constitutional consequences." Reply Brief of PETA in Support of its Motion for Preliminary Injunction, dated June 26, 2000, at 8 n. 1. Any limitations placed on such access must be justified under strict First Amendment scrutiny. See id. at 8. PETA's contention represents one of the unique dimensions raised by this case. Under this approach, the issue is not the opening of otherwise nonpublic government property for particular expressive purposes but the closing, or more precisely the temporary reservation, of some portions of traditional public spaces for the purpose of accommodating limited expressive activities. Broadly construed, PETA's theory implies that the status of traditional public forum property is immutable and that once parks, streets, sidewalks and plazas are so dedicated, they maintain their public forum quality for all purposes and at all times. Therefore, they must remain open for expressive activities with unrestricted access to the public at large, except when the government makes a justifiable case that the properties are required to serve another compelling state interest.
At least as it relates to expressive activities, the argument may be sound if the premise were valid that any use of public spaces the government permits for expressive purposes on any portion of traditional public property automatically transforms the space into a public forum. PETA's contention therefore raises a threshold issue. Can the government, without demonstrating a compelling state interest, dedicate a portion of traditional public property such as a park, plaza, sidewalk or street for the purposes of conducting a public event for expressive activities that limits access to particular speakers or to particular forms of speech? In other words, using the parlance of the public forum doctrine, may the government create a limited or a nonpublic forum within the confines of traditional public forum property without strict First Amendment justification?
Any consideration of this issue must take as its point of departure the principle that "[t]raditional public forum property occupies a special position in terms of First Amendment protection." United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). Public streets, parks, sidewalks and plazas are accorded this unique recognition because, in the Court's oft-quoted words, they have "immemorially been held in trust for the use of the public for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of streets and public places has, from ancient *312 times, been part of the privileges, immunities, rights and liberties of citizens." Hague v. Committee for Indust. Orgs., 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). By virtue of the vital historical role these spaces have served as avenues for free expression, and given the interest all members of the public share in a guarantee of the freest access to them for these purposes, traditional public properties constitute public forums per se. General access to them sought for open assembly and debate available to the public at large preexists and is presumed "regardless of the government's intent." Forbes, 523 U.S. at 678, 118 S.Ct. 1633. Availability for general expressive purposes is not a matter of grace by government officials but rather is inherent in the open quality of the locations. See United States v. Kokinda, 497 U.S. 720, 743, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990).
Reaffirming the elevated standing conferred upon public forum spaces, the Supreme Court has recognized limits on the government's ability to restrict all protected expression on sidewalks, stating that a prohibition that results in the destruction of public forum status is "at least presumptively impermissible." Grace, 461 U.S. at 180, 103 S.Ct. 1702. The Grace Court added that the government also may not transform the character of public forum property "by the expedient of including it within the statutory definition of what might be considered nonpublic forum" property. Id. See also Greenburgh Civic, 453 U.S. at 133, 101 S.Ct. 2676 ("Congress, no more than a suburban township, may not by its own ipse dixit destroy the `public forum' status of streets and parks which have historically been public forums....").
At the same time, however, the Supreme Court has recognized that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." Greenburgh Civic, 453 U.S. at 129, 101 S.Ct. 2676. This principle was underscored in Cornelius, 473 U.S. at 799, 105 S.Ct. 3439. There, the Court noted that "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Id. at 799, 105 S.Ct. 3439. Accordingly, the state may establish a forum on public property and reserve it for its intended purpose, "communicative or otherwise", "as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speakers view." Perry, 460 U.S. at 46, 103 S.Ct. 948. Driving these principles is a vital government interest in matters of public governance concerning the scope of the state's authority to exercise dominion and control over public spaces. The Supreme Court has repeatedly given expression to the bounds of this interest, asserting that "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." Adderley v. Florida, 385 U.S. 39, 47, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). See Perry, 460 U.S. at 46, 103 S.Ct. 948; Greenburgh Civic, 453 U.S. at 129, 101 S.Ct. 2676; Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976).
The right of the people to have general access to traditional public places for expressive activities sometimes competes with the interests of the state, in the course of internal governance, to exercise control over public property. On the occasions the Supreme Court has been called upon to resolve conflicts and apply the preceding general principles, it has attempted to balance and reconcile these divergent interests. The equilibrium the Court has strived for applies the logic and wisdom of both sets of interests, seeking to promote broad public access for expressive purposes, while at the same time allowing government discretion to achieve the purposes for which public properties are intended in light of the various conflicting *313 interests that often simultaneously compete for their use. To this end, the Court has considered and consistently rejected the categorical proposition PETA advances here.
In Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), a political candidate was denied access to place a campaign advertisement on the commercial "car cards" located on city transit vehicles. The city's transit system, by policy and longstanding practice, did not permit any political or public issue advertising on its buses, although it had accepted ads from commercial establishments and public interest groups. Lehman contended that, presumably because the buses operated on public streets, the car cards they carried for advertising therefore constituted a public forum protected by the First Amendment, and that there was a guarantee of nondiscriminatory access to such publicly owned and controlled areas of communication "regardless of the primary purpose for which the area is dedicated." Id. at 301, 94 S.Ct. 2714. The Court acknowledged that while its jurisprudence, in light of the First Amendment, has been jealous to preserve access to public spaces for purposes of free speech, "the nature of the forum and conflicting interests involved have remained important in determining the degree of protection afforded by the Amendment to the speech in question." Id. at 302-03, 94 S.Ct. 2714. Noting that the transit system's car cards were part of a commercial venture in which the city was engaged, and that the city had consciously limited access to the spaces, the Court found "no First Amendment forum." Id. at 304, 94 S.Ct. 2714. Accordingly, in examining the constitutionality of the state action, the standard applied was whether the policies and practices in question were "arbitrary, capricious, or invidious." Id. at 303, 94 S.Ct. 2714.
In a somewhat different context, the Court in Kokinda, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571, applied a forum analysis to reject an argument that a sidewalk on Postal Service property leading to the entry of the post office was a traditional public forum and that therefore any restriction on its use for expressive activity required strict scrutiny. Relying on Lehman's proprietary capacity principle, and noting that "the mere physical characteristics of the property cannot dictate forum analysis," id. at 727, 110 S.Ct. 3115, the Court upheld the Postal Service's ban on solicitation on its sidewalk, even though the Service permitted a broad range of other forms of speech on the same property. See City Council of City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (rejecting the argument that street poles constitute a public forum by virtue of their location on traditional public forum property); Heffron, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (finding that an annual state fair  a temporary exposition of arts and sciences exhibits on state-owned grounds  constituted a limited public forum).
The same analytical approach, yielding similar outcomes, has been followed by other courts that have addressed these issues. See New York Magazine, 136 F.3d 123 (advertising spaces on public buses, and not the streets on which the vehicles run, constituted the relevant forum); Texas v. Knights of Ku Klux Klan, 58 F.3d 1075 (5th Cir.1995) (an adopt-a-highway program established by the state for the purposes of public highway debris removal that entitled participating organizations to place their names on a sign located on a portion of a state highway assigned to them for cleanup created a nonpublic forum); Calash v. City of Bridgeport, 788 F.2d 80 (2d Cir.1986) (municipal sports arena built on city park land and limited to use by charitable organizations did not create a public forum entitling access for a private rock concert); East Timor, 71 F.Supp.2d 334 (city program permitting temporary renaming of streets with promotional or commemorative signs created a limited public forum).
*314 What emerges from these cases, alluded to in Kokinda, is an affirmation and accommodation of two complementary principles: that (1) while streets, sidewalks and parks, without more, may constitute a public forum where general public expression is unquestionably entitled to special First Amendment protection, (2) not every such property by virtue of that fact alone constitutes a public forum under all circumstances. Rather, "the location and purpose of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum." Kokinda, 497 U.S. at 728-29, 110 S.Ct. 3115 (citing Grace, 461 U.S. 171, 103 S.Ct. 1702). If the "location and purpose" entail, as in Grace, spaces the government by law, policy or practice has declared open to all members of the general public for assembly and debate, the First Amendment demands that any restriction on access sought for protected expression must be justified under strict scrutiny. See Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). On the other hand, as exemplified by Lehman, 418 U.S. 298, 94 S.Ct. 2714, and Taxpayers for Vincent, 466 U.S. 789, 104 S.Ct. 2118, where the government, in order to serve legitimate purposes, carves out, within traditional public forum property, a portion of space not open to the general public, either specifically or incidentally limiting some expressive activities to particular speakers or subjects, the Court has recognized the resulting forum as a nonpublic forum where the regulation of speech is subject to a lower grade of First Amendment review.
Under the preceding analysis, PETA's argument fails on two fronts. It suggests that the government must offer compelling reasons not only to restrict access to any expressive activity conducted on traditional public forum spaces, but also to justify its undertaking the forum in the first place. According to PETA, it would not be a legitimate function for the government, absent compelling justification, to use traditional public property for events of limited scope not open to the public equally. The Supreme Court's public forum doctrine as developed in the cases described rejects both aspects of this theory. PETA's reasoning confuses the application of the compelling interest doctrine, which developed as a standard of review to define the range of permissible state restrictions on expression, with the government's underlying authority to use or exercise control over public property for legitimate state purposes it deems appropriate. The government's right to engage in public functions, on public property or otherwise, derives from its relevant constitutional and statutory authority, the exercise of which does not necessarily require the state to offer compelling reasons.
PETA's argument would also effectively render meaningless the concept of the limited and nonpublic forums. As the Supreme Court stated in Perry, "[i]mplicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity." 460 U.S. at 49, 103 S.Ct. 948. Similarly, in describing its application of the limited public forum, the Second Circuit has said that the forum arises "when government opens a nonpublic forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects," in which event "constitutional protection is afforded only to expressive activity of a genre similar to those that government has admitted to the limited forum." Travis, 927 F.2d at 692. PETA offers no persuasive support for its proposition, and the Court finds none in case law or practice.
As a general proposition, inherent in the right of ownership and control over property, for government as for private persons, is the right, assuming compliance with applicable laws and constitutional norms, not only to preserve its existing use, but to alter the property's function, to adapt it to different ends, to open or close *315 access, and to include or exclude particular people or activities. See, e.g., Rakas v. Illinois, 439 U.S. 128, 143-44 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) ("one of the main rights attaching to property is the right to exclude others"); Taxpayers for Vincent, 466 U.S. at 814, 104 S.Ct. 2118 ("At some point, the government's relationship to things under its dominion and control is virtually identical to a private owner's property interest in the same kind of things."). Also a natural concomitant of a state's proprietary role in managing internal operations is the ability to use public property not only for expressive purposes, but to achieve other legitimate purposes such as those at issue here: to raise revenue, provide entertainment and promote tourism.
Thus, PETA's argument implicates not so much the status of particular parks or streets, but the scope of the government's power to administer its own operations as these relate to the uses of public property and things. On this point, pertinent by analogy, the Supreme Court has said that "[t]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs." Cornelius, 473 U.S. at 805, 105 S.Ct. 3439 (quoting Arnett v. Kennedy, 416 U.S. 134, 168, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)). In demarcating the proper perimeters of that discretion as it relates to management of public properties, the Court has recognized degrees and distinctions in the state's authority over expressive activity that derive from the capacity in which the government exercises public functions. Where the government acts as lawmaker or regulator establishing norms of conduct and affecting general access for expressive activities, an infringement on speech must serve a compelling state interest and be narrowly tailored to achieve the designated purpose. But when the government places limits on expression in nonpublic spaces while acting in a "proprietary capacity" for the purposes of raising revenue or managing internal operations, a reduced standard of First Amendment scrutiny is demanded. See Kokinda, 497 U.S. at 725, 110 S.Ct. 3115; Lehman, 418 U.S. at 305, 94 S.Ct. 2714; New York Magazine, 136 F.3d at 129.
PETA's argument also ignores that even within quintessential public spaces, not every corner of property is presumed suitable and dedicated for use by all persons and at all times for expressive purposes. Were this view to prevail, for example, the First Amendment would preclude the government, absent compelling reasons and subject to strict scrutiny, from closing a portion of a public street to build public housing or from dedicating a portion of a park for passive uses while denying access for a rock band's performance. The First Amendment does not command such a constraining view of the government's authority to exercise dominion over public property when needed to serve other legitimate purposes. See Calash, 788 F.2d at 80.
Finally, this Court must be mindful of other public interests touched by this controversy. The Supreme Court has recognized that limiting access to government property through opening nonpublic forums for selective expressive activities fosters free expression, stating that "[b]y recognizing the distinction [between general and selective access], we encourage the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all." Forbes, 523 U.S. at 680, 118 S.Ct. 1633. This policy objective is just as pertinent and compelling as applied to refute PETA's theory. If the government were precluded, at the risk of violating the First Amendment, from creating a nonpublic forum or a limited forum by temporarily reserving a portion of a traditional public space and limiting access to selected expressive activities or particular speakers, under certain circumstances it may choose not to proceed with the activity. The City here has stated as much. See City Memo at 12. ("Faced with the controversy such a situation would engender, it is more likely that *316 the City would not undertake such a public art project at all."). Whether the City may have in fact abandoned the CowParade had it known that its view of the limitation would not prevail, or whether an implicit threat would ever materialize, is not now before this Court to pass upon.
What is significant on this score is the policy consideration that also weighs against PETA's argument. An essential point this Court cannot overlook in evaluating and passing upon a novel legal theory such as that PETA advances is the guiding wisdom that a rule of law inherently possesses transcendent temporal and spatial dimensions. If it is found just and is validated, such a rule could extend its regenerative force, succession and relevance beyond its borders, beyond the parties and the immediate controversy, potentially influencing the future conduct of public officials and other persons encountering comparable situations. Accordingly, a relevant concern for the Court weighing an unsettled concept or matter of first impression such as that urged upon it here should be to avert an outcome that, in the name of protecting one party's right to expression from application of a reasonable limitation, may curtail not only broader expressive rights of a much larger public but also the governance interests of the government by discouraging it from opening public spaces for expressive activities such as those before this Court.
Precisely how far government latitude may extend to encroach upon traditional public forum property in order to establish, within the bounds of such spaces, a limited or a nonpublic forum intended to serve purposes involving narrower expressive activities, this Court does not need to decide. Wherever that line may be drawn, the limitation at issue here on expressive activities in public spaces is far from the scope of the blanket restrictions on general public access to sidewalks that the Supreme Court declared may impermissibly destroy the special status enjoyed by traditional public forums. See Grace, 461 U.S. at 180, 103 S.Ct. 1702. Consequently, the Court does not accept PETA's traditional public forum argument.

Public Forum By Access Sought
PETA asserts alternatively that the CowParade exhibit constitutes a public forum by virtue of the access PETA seeks. It relies on the Supreme Court's determination in Cornelius that the relevant forum was the government's charitable contributions campaign among its employees, and not the physical property of the federal workplace, because "in defining the forum we have focused on the access sought by the speaker." Cornelius, 473 U.S. at 801, 105 S.Ct. 3439. PETA then contends that the property to which it sought access for its message was the City's streets and parks. This argument overlooks the fact that, as Cornelius also instructs, "forum analysis is not completed merely by identifying the government property at issue." Id. Rather, the Court has elaborated that when the speakers seek "general access" to public property, the forum encompasses that property. See id. When limited access is sought, the Court has taken a "more tailored approach" to defining the boundaries of a forum within the confines of the government property. Id.
The ultimate test that emerges from Cornelius is that a public forum is not created by government inaction or by its permitting limited discourse, but "only by intentionally opening a non-traditional forum for public discourse." Id. at 802, 105 S.Ct. 3439. The Government's intent may be discerned from the stated terms and conditions expressed in the policy defining the forum and its associated limitations on access; from actual practice pursuant to the articulated policy; from the requirement of a government permit to obtain access; and from the nature of the property and its compatibility with the expressive activity. See; United Food & Commercial Workers Union v. Southwest Ohio Regional Transit Auth., 163 F.3d 341, 352-53 (6th Cir.1998); Air Line Pilots Ass'n v. Department of Aviation of City of *317 Chicago, 45 F.3d 1144, 1152 (7th Cir.1995); East Timor, 71 F.Supp.2d at 345.
PETA's argument does not satisfy any of these criteria. First, the public space to which PETA seeks access is not strictly, as PETA contends, traditional public forum property, nor is PETA's request one for "general access." Rather, as the more tailored approach to the forum analysis demanded here would suggest, PETA seeks and has been denied access to a government program, a public event comprised of approximately 500 privately financed sculptures in which each cow itself constitutes the physical means for conveying expression within the defined limitations. In support of the goals of the exhibit, the City reserved portions of certain traditional public spaces on which to place 366 of the decorated cows, by this means seeking to serve not just limited expressive purposes but other legitimate governmental objectives as well.[11]
Second, nothing in the record supports a conclusion that in authorizing the placement of a limited number of decorated cows in public open spaces the government here evinced any intention to open a forum inviting indiscriminate access for public discourse through the artwork in the exhibit. The limit on the number of cows in public areas, the application fees and the design limitations and other terms imposed upon participants, indicate that not every sponsorship applicant or cow design was indiscriminately guaranteed acceptance to the CowParade. The exhibit's governing contract and Guidelines offer guidance as to the government's intent, unequivocally manifesting a purpose to limit both the number of participants and the forms of expression to be permitted. The City required the CowParade Organizers to obtain a permit in order to conduct the exhibit as a whole, and each prospective sponsor was obligated to enter into the Agreement defining the prerequisites for participation in the exhibition. While courts have recognized the inherent limitation of placing reliance solely on the government's explicit intent and have looked also to its actual practice in defining the type and purposes of the relevant forum, see United Food, 163 F.3d at 349; East Timor, 71 F.Supp.2d at 345, because the CowParade is a unique, one-time event, no past practice exists here that may be cited to indicate intention contrary to the stated purposes of the forum. But the actual practice of the City and CowParade Organizers, as applied in relation to the stated purposes of the limited forum here, as discussed below, appears consistent.
Third, the nature of the property is not compatible with the unlimited expressive activity PETA proposes. Under the program as defined by the City and the CowParade Organizers, the public property to which PETA requests access is not just a portion of sidewalk, plaza or park, but a portion of such space now occupied by the exhibit's decorated cow sculptures. The structures are owned not by PETA nor by the City, but by the CowParade Organizers. The forum from which PETA's cow design was excluded therefore is not a particular corner of a sidewalk or park, but the actual cow artwork with the message PETA would place there under the auspices of the CowParade program.
To this limited extent, and for the limited ends of the exhibit, the City altered portions of public spaces that traditionally had been devoted to unrestricted public access for expression protected by the First Amendment. While PETA may *318 have a right of general access to these open spaces when they serve exclusively as a public forum, PETA does not have an unlimited right of access to the property as altered by the City's addition of the CowParade exhibit sculpture that was not there before. PETA ordinarily would not be entitled to place a permanent structure, even an artwork, on a public sidewalk or park. And while PETA may have First Amendment freedom to use public forum property for protected speech, that right is not accompanied by an unlimited license to place a statue or other structure indefinitely on public open spaces, any more than the right to address an audience from the platform of a public monument would confer upon a speaker the freedom to paint a message on it, or to readorn with graffiti property owned by the government or by another person. See Kaplan v. City of Burlington, 891 F.2d 1024 (2d Cir.1989) (upholding denial of a permit to a group seeking to erect a menorah in a city park).
Fourth, a close examination of the public properties encompassed by the CowParade exhibit supports a conclusion that the event was not intended as a public forum. The City's restriction on access to the use of certain portions of its traditional public spaces is specifically confined to a defined portion of its stock of streets, sidewalks and parks dedicated to the purposes of the CowParade. Here, in order to achieve the intended goals of its program, the government not only evidenced no intent to open a public forum, but took action manifestly signifying the contrary, temporarily restricting general access to selected portions of traditional public forum spaces for a period of approximately three months. There is no blanket exclusion here of general access to First Amendment protected activities on traditional public spaces of the categorical scope the Court in Grace deemed "presumptively impermissible." 461 U.S. at 180, 103 S.Ct. 1702. As discussed infra, the denial of access to PETA to sponsor a cow in the exhibit does not in any way implicate or interfere with PETA's ability, with or without the aid of its own artwork as a means of expression, to carry out its mission, giving free expression to its entire message on any other public street, park or sidewalk space in the City.
For all of the foregoing reasons, this Court concludes that the public forum doctrine does not support PETA's theories and that the forum the City created for the purposes of the CowParade was not a public forum. Accordingly, the Court now addresses the City's argument that it sought to open only a limited public forum.

Limited Forum
Applying the preceding analysis to the present case, this Court concludes that the forum here is not a designated public forum. As the Supreme Court determined in Cornelius, a finding that a public forum has been created cannot be made "in the face of clear evidence of contrary intent...." 473 U.S. at 803, 105 S.Ct. 3439. The Court also can not "infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." Id. In the present case, there is persuasive evidence demonstrating purposeful action by the City and the CowParade Organizers not to create a public forum generally open to use for indiscriminate expressive purposes of the public at large. Under the program's definition, access was provided selectively to sponsors who were to be prequalified on the basis of the aesthetic appeal and appropriateness of their cow designs, conformance with the stated Guidelines and the payment of a fee. The particular sponsors ultimately granted this selective access thus were individually required to obtain permission to participate in the exhibit. See Forbes, 523 U.S. at 678-79, 118 S.Ct. 1633. For the reasons more fully set forth below, indiscriminate public entry would be inconsistent with the purposes of the event, and the nature of the properties is incompatible with expressive activities universally open and unrestricted as to content.
Since the forum here falls neither within the traditional nor designated category, it *319 necessarily must qualify as either a nonpublic forum or a limited public forum arising from the opening of a nonpublic forum, in accordance with this Court's forum analysis as set forth above. In either event, the outcome here would be the same. The scope of the forum was limited to the approximately 500 approved sponsors given selective access, and to expression in accordance with the overall purposes of the exhibit and its Guidelines. These are the hallmarks of the nonpublic forum as described in Forbes. See id. This Court leaves it to another day and higher authority to resolve the apparent ambiguity that permeates prior forum analysis. Feeling bound to abide by the most recent, explicit formulation of the Second Circuit, this Court concludes that the standard of First Amendment scrutiny applicable to the nonpublic forum, or to the limited public forum concept as expressed by the Second Circuit, is that applied in Good News Club, 202 F.3d 502, New York Magazine, 136 F.3d 123, and Bronx Household, 127 F.3d 207. In these forums, as the Circuit Court has held explicitly, restrictions on access based on speaker identity and subject matter are permissible only if "the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." Bronx Household, 127 F.3d at 211-12 (citing Cornelius, 473 U.S. at 806, 105 S.Ct. 3439).

REASONABLENESS

A. Criteria

The Supreme Court's forum analysis cases, as elaborated by the Second Circuit, describe the proper framework and provide guidance for assessing and applying the reasonableness test to particular restrictions on speech in a nonpublic forum or in a limited forum as here understood. The Perry Court recognized that "[i]mplicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity." 460 U.S. at 49, 103 S.Ct. 948. The Court then declared that the touchstone for evaluating these distinctions is the purpose which the forum at issue serves. See id.
The Supreme Court reaffirmed this standard in Cornelius, where it reiterated that reasonableness in this context must be assessed in the light of the purpose of the forum "and all the surrounding circumstances." 473 U.S. at 809, 105 S.Ct. 3439. Citing Perry and Lehman, the Court further expounded that speakers may be excluded from a nonpublic forum if they wish to address a subject not within the purpose of the forum, or if they are not members of the class of persons for whose benefit the forum was created. See id. The government violates the First Amendment when it "denies access to a speaker solely to suppress the point of view he espouses on an otherwise includable subject." Id. Finally, the Court stressed that in a nonpublic forum the restriction on access need only be reasonable, "it need not be the most reasonable or the only reasonable limitation." Id. at 808, 105 S.Ct. 3439.
In these and subsequent decisions further developing the public forum doctrine, the Court has indicated some of the surrounding circumstances it has considered relevant to, and persuasive in, the evaluation and determination of reasonableness, including: (1) whether the exclusion of access drawing distinctions as to speakers or subjects is adopted pursuant to a government policy, practice or stated criteria and is justified on grounds from which it is possible to discern the state's purpose in creating the forum, the forum's relation to the excluded expression, and the limitation's impact on protected expression and its objective application to avoid impermissible viewpoint discrimination; (2) fair, impartial administration and application of the restriction under circumstances suggesting that the public officials limiting access to expressive activities were mindful of the effect of their restriction on speech and endeavored to apply the policy, practice or stated criteria in good faith, avoiding measures that would cross over *320 the line into what may be demarcated arbitrary, capricious or invidious state action; (3) the availability of alternative channels of communication for the speaker to reach the forum's audience; (4) the government's interest in avoiding potential conflict which might impair its ability to achieve the intended purposes of the venture for which the nonpublic forum was created; (5) the extent to which the excluded expressive activity is incompatible with the uses of the property or would interfere with the government's forum objectives; (6) the limitation of speech per se is not the motivating goal of the restriction on access but an incidental or inevitable consequence of creating the nonpublic forum; and (7) whether the exclusion of access is adopted by the government acting in its proprietary capacity, managing its internal operations. See Forbes, 523 U.S. at 681, 118 S.Ct. 1633; Kokinda, 497 U.S. at 725, 110 S.Ct. 3115; Cornelius, 473 U.S. at 809, 105 S.Ct. 3439; Perry, 460 U.S. at 53-54, 103 S.Ct. 948; Heffron, 452 U.S. at 655, 101 S.Ct. 2559; Lehman, 418 U.S. at 303, 94 S.Ct. 2714; New York Magazine, 136 F.3d 123; Bratton, 95 F.3d 224; Lebron, 69 F.3d 650; Travis, 927 F.2d 688. These surrounding circumstances, as discussed below, all characterize the government's action in this case.

B. The Criteria Applied

1. The CowParade Guidelines

The question of the reasonableness of excluding expression in a limited public forum may arise from the specific language describing the limitation and from the scope of the restriction itself. PETA challenges the limitation here on both grounds. The City and CowParade Organizers argue that in order to achieve their expressive, economic, civic and aesthetic purposes, they designed and produced an exhibit that would be festive, decorous, whimsical and appropriate for a broadbased audience of all ages. See, e.g., City Memo at 9, 11, 13. The exclusion of designs containing "religious, sexual or political" subjects was intended as a means to these ends. PETA contends that these standards cannot withstand constitutional scrutiny, because they are impermissibly overbroad and vague, and because they give government officials excessive discretion, thereby inviting prior restraint.
The First Amendment public forum cases decided by the Supreme Court and by the Second Circuit have upheld as reasonable, in the context of nonpublic or of limited public forums, regulations and exclusions the content of which is comparable to, or indeed even more generally articulated, than the restriction in the CowParade Guidelines here in contention. The Executive Order challenged in Cornelius, for example, limited participation in the Combined Federal Campaign to certain voluntary, charitable, health and welfare services organizations and specifically excluded "agencies that seek to influence the outcomes of elections or the determination of public through political activity or advocacy, lobbying, or litigation on behalf of parties other than themselves." 473 U.S. at 795, 105 S.Ct. 3439.
In Lehman, the city's agreement with a private agency to manage advertising in its transit system excluded "political advertising". 418 U.S. at 299-300, 94 S.Ct. 2714. Pursuant to the contract, the agency adopted a written policy not to accept "any political copy that pictorially, graphically or otherwise states or suggests that proponents or opponents of the persons or measures advertised are vulgar, greedy, immoral, monopolistic, illegal or unfair." 418 U.S. at 300 n. 1, 94 S.Ct. 2714. There, the transit system did not permit political or public issue advertising on its vehicles, applying that policy to reject an ad from a candidate for public office while accepting commercials from businesses and public service groups. Id. See also Lebron, 69 F.3d at 654 (Amtrak's unwritten policy of rejecting political advertising on the "Spectacular" sign at Penn Station upheld to reject a public issue advertisement, though Amtrak's advertising licensing agreement permitted public service announcements from charitable organizations that adhere to "good taste, decency and *321 community standards"). Even broader discretion in justifying exclusion from a nonpublic forum was sustained by the Forbes Court. See Forbes, 523 U.S. at 671, 118 S.Ct. 1633. In denying participation to an independent candidate in a televised debate among the nominees of the major political parties, the public television station, which lacked objective, definitive standards to guide its exclusions, relied only upon "a bona fide journalistic judgment that our viewers would be best served by limiting the debate" to the candidates already invited. See id.
The validity of very broadly worded regulations and the reasonableness of their application have also been upheld in other contexts entailing the exercise of discretion by government officials to limit artistic expression or exercise aesthetic preferences in managing particular state property or publicly designated spaces. See, e.g., National Endowment for the Arts v. Finley, 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998); Ward v. Rock Against Racism, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)(discussed infra). These subjective value judgments, if they are not viewpoint discriminatory, have been sustained when they give effect to aesthetic, economic or moral values and other general welfare interests of the larger community. The situation arises frequently in the context of government protection of historic or aesthetic values and when it serves as patron of the arts. These cases provide useful analogues for determining whether an "appropriateness" standard may be too vague or arbitrary, because they implicate the same unique combination of circumstances at issue before this Court: uses of property in which the public has a vital interest, public expression of artistic preferences, and government actions grounded on subjectively applied general standards that may have incidental or even substantial effect on First Amendment rights.
Historical and aesthetic concerns have been held sufficient to support broadly framed government standards permitting reasonable restrictions on speech, even with regard to traditional public forum properties. See Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 100 F.3d 175, 188 (1st Cir.1996) (affirming "aesthetic interest in preserving the District's historical and architectural character" and acknowledging government interests in historical preservation such as promoting tourism). Courts defer to governmental aesthetic judgment in evaluating restrictions on speech as long as the regulation is content-neutral, serving purposes unrelated to the content of expression or disagreement with the message. See Ward, 491 U.S. 781, 109 S.Ct. 2746 (holding that noise regulation designed to prevent disturbance of surrounding residents and requiring the city to provide "the best sound for all events" was not vague and did not violate speech rights of performers required to use the city's sound equipment); Maher v. City of New Orleans, 516 F.2d 1051, 1062 (5th Cir. 1975) (although no concretely objective criteria were applied to prevent the demolition of a property, "to satisfy due process, guidelines ... need not be so rigidly drawn as to prejudge the outcome in each case, precluding reasonable administrative discretion.").[12]
*322 Similarly, when the government acts as a patron allocating competitive grants to the arts according to legislative criteria, First Amendment concerns somewhat analogous to those presented here frequently arise challenging the effect of government regulations on protected expressive activities. Inevitably, such imprecise criteria allow for the government exercise of broad discretion and subjective judgments. See Finley, 524 U.S. 569, 118 S.Ct. 2168. As the Supreme Court noted in Finley, at times such provisions are "undeniably opaque" in a way that would raise substantial vagueness concerns in a regulatory scheme or criminal statute. Id. at 589, 118 S.Ct. 2168. But in the context of the government's acting as a patron, "it is not always feasible for Congress to legislate with clarity," id., and "the consequences of imprecision are not constitutionally severe." Id.
The guidance these examples offer is that concerns of historical, aesthetic or artistic appropriateness, not unlike those at issue in this case, are not easily, if ever, completely quantifiable or objective. The cases instruct that whether serving as patron of science and art, or promoting historical and aesthetic values, or, as in the case at hand, managing internal affairs in regard to the use of public spaces, the government requires a reasonable zone for exercise of discretion and flexibility which is not always capable of being articulated as precise and universal standards. The Constitution does not demand mathematical exactitude or code-like criteria to guide government decisions in these unique circumstances, some of which inevitably entail application of subjective judgments. Consequently, absent objective criteria to guide decision makers, the measure of reasonableness of broadly worded restrictions is not so much the objective precision of the language describing the guidelines as the way state officials adhere to them, as indicated by the government's demonstration of overall consistency, non-discrimination and good faith, as well as by the absence of evidence that intent to regulate speech may have been the real motivation for the challenged limitation on expression.
Under the standards and precedents described above, this Court concludes that the limitation here is not unreasonably vague or overbroad. The restriction on expressive activity was carried out pursuant to the Guidelines which, albeit broadly and generally formulated, are sufficient to withstand First Amendment challenge in the context of the nonpublic or limited *323 forum found here. As the Court noted in Cornelius, in such public spaces, there is "[no] requirement that the restriction be narrowly tailored or that the Government's interest be compelling." 473 U.S. at 809, 105 S.Ct. 3439. Having found that the government's interest here forms a reasonable basis for the imposition of limitations on free expression, and that the restrictions adopted were not impermissibly vague or overbroad, the Court now turns to the reasonableness of the standards as applied by the Committee.

2. Administration of the Guidelines

The instant controversy differs from the cases discussed above not only in how the nonpublic or limited forum was created but in how the restriction on access was applied, as PETA was not barred from the event altogether. PETA was included in part and excluded in part. It was limited only as to a portion of the second design it sought to enter in the exhibit, and was afforded an opportunity to modify that design so that it would be allowed in the exhibit. According to the City and CowParade Organizers, the restriction was not addressed to PETA as an advocacy organization but to a portion of PETA's message not consistent with the purposes of the forum, and to the manner and terms by which PETA sought to convey it. They attribute their finding and exclusion to various explanations: that the offending text contained terms whose overall effect was excessively graphic and purposely provocative, that the message represented overtly aggressive political advocacy; that the language was not appropriate for a broad-based audience of all ages, especially children; and that the design was "inappropriate" in that it did not comport with the spirit of festive, whimsical and decorous entertainment envisioned for the exhibit. See Chass Aff. at ¶ 6; Slarskey Aff. at ¶¶ 8, 14; and City Decl., Ex. G. No single consideration was offered as controlling.
In defending the limitation, the City also advanced another theory that bears particular comment. The City contended that the expressive purpose contemplated for the CowParade is humorous entertainment, that the exhibit was not intended as a forum for public discourse or the exchange of ideas, and that therefore PETA's message-based designs could be excluded as inconsistent with this stated purpose. This notion strikes the Court as somewhat curious. It implies that, as though by some Cartesian means, art may be disassociated from ideas, or entirely drained of conceptual content, leaving a residue of nothingness. This Court cannot lend weight to that premise. It is doubtful that many of the artists invited to submit artwork for consideration in the exhibit would have understood that, artistically, their renderings would be held to a standard of vacuousness. Nor could the City persuasively establish that all, or even most, of the designs the Committee deemed acceptable are wholly devoid of any attempt to portray and exchange purposeful impression. Were that the standard to be imposed to reject artwork submitted in connection with activities in a government forum such as that present here, such state action, in this Court's reading of the public forum doctrine, would be suspect. For, almost by definition, art is a willed representation of idea. Art stripped of all thought describes a void, or a virtual impossibility, like matter without substance. In fact, art is a poetry of ideas, a medium for the very embodiment of thought.
But just as expression of thought in words may be sublime, it also could be profane. Inasmuch as it may delight, it may offend, heal as well as hurt. The same pertains to art. Some communication can be no less objectionable or inappropriate because the means chosen to convey it may be a form of art. See Burton v. Crowell Publishing Co., 82 F.2d 154, 155 (2d Cir.1936) (L. Hand, J.) (noting that pictures and drawings may be as libelous as the written word). Proven, a libel is as much a libel whether spoken from a soapbox, published in a letter, or painted on the Mona Lisa. Thus, as is the case with *324 communication through ordinary language, artistic expression cannot serve categorically as a shield that may be raised as a defense at all times, in all places, by all people if in fact it is convincingly shown to give offense. The question here is whether, within constitutional bounds, PETA's rejected design presents such a case.
One of the most problematic issues in this case relates to what standards were, in fact, applied as the basis for the Committee's determination that PETA's rejected design may inappropriately give offense. PETA argues that the substantive criteria the Committee followed were not limited to the Guidelines language, which specifically denoted religious, sexual or political material as not acceptable. These terms are nowhere defined in the Guidelines or Sponsorship Agreement with any specificity. It is not clear, for example, whether the term "political" is intended to cover social, ideological and ethical ideas, or whether it relates only to public governance or campaign electioneering. The concept of what is political is necessarily broad. Under varying circumstances, it may or may not be construed to encompass the full range of human thought and activities, conceivably including a message, such as that on PETA's cow designs, exhorting people to change their behavior or to examine their lives and lifestyles. See, e.g., Lebron, 69 F.3d at 653 (upholding Amtrak's rejection, under an unwritten policy of not accepting "political advertising" on a particular commercial sign, of a proposed display critical of a beer company's alleged support of right wing causes and intended as "an allegory about the destructive influence of a powerful, urban, materialistic and individualistic culture on rural, community based, family-oriented and religious cultures.").
This semantic reality renders it difficult to determine whether rejection of PETA's design was grounded solely on application of the "political" standard per se. Certainly, given the inherent connection between art and expression of thought, if the exclusion here were intended and applied to foreclose the conveyance of any form of social content or idea on the cow designs, such an expansive limitation in the context of a public exhibition of art would pose a formidable constitutional challenge. However, it was not as much the "political" content of the PETA cow, as the way in which parts of the message were conveyed, which caused the Committee to find the design "inappropriate." See City Decl., Ex. G., Chass Aff. at ¶ 7. The fact that the PETA cow design which was accepted was also intended to convey PETA's particular message that was no less "political" than the one rejected suggests that the Committee did not apply to PETA a concept of "political" driven by ideological content. Furthermore, the only cow design explicitly disapproved as "political" was one which referred to Mayor Giuliani by name, in that application suggesting a more traditional definition of "political." See City Decl., Ex. G.
But the record indicates that PETA's cow was rejected not strictly on the basis of the Committee's general notion of what constituted "political" but on other grounds of inappropriateness of PETA's design with the stated purposes of the event. These expressive objectives contemplated an exhibit that would be festive, whimsical and appropriate for a broadbased audience of all ages. Commercial goals of promoting tourism and stimulating the economy were cited by Mayor Giuliani. See Gifford Decl., Ex. F. Generating revenues designated for park improvements is another objective articulated in the Permit. See City Decl., Ex. B at ¶ 9. In assessing the reasonableness of the City's rejection of PETA's design on the basis of these considerations, therefore, the Court will look not solely to the language of the Guidelines but also to whether there otherwise existed a sufficiently clear mandate to guide the Committee that was not too vague and that, consistent with achieving the overall purposes of the exhibit, was carried out in a manner that was not arbitrary, capricious or invidious.
*325 The evidence suggests that the Committee apparently considered its charge to be to assess the appropriateness of the designs, taking into account the Guidelines as a whole and considering the purposes of the CowParade. As described above, the Guidelines given to artists required them to consider that the audience would encompass people of all ages and to avoid specific subject areas. In the April 5, 2000 internal memorandum from the Committee, the Committee further articulated the standards it had decided to apply in determining which designs were appropriate. See id. There was substantial unanimity among the Committee as it selected only approximately 20 of 1200 designs for discussion as raising some concern and unanimously rejected only four designs regarded as inappropriate. See City Decl., Exs. F, G; Slarskey Aff. at ¶¶ 4, 8, 14; Chass Aff. at ¶¶ 6-8. This evidence suggests a reasonably uniform conception and understanding among Committee members as to what they considered appropriate and consistent with the purposes of the exhibit. That consensus also suggests some reasonableness in application, in that there was full agreement as to the inappropriateness of the rejected three panels of PETA's cow by the government officials charged with making such a determination. See Chass Aff. at ¶ 8.
The question now before the Court becomes whether in the nonpublic or limited forum found here the partial exclusion of expression was permissible under the First Amendment. For this inquiry, the Court must return to the guidance offered by the Supreme Court and the Second Circuit in articulating the rules that govern restriction of access for expressive activity in the type of forum found here. The Perry Court declared that "not all speech is equally situated" on government property that has not been made a public forum. 460 U.S. at 55, 103 S.Ct. 948. A speaker seeking to address a topic not encompassed within the purpose of the forum may be excluded. See Cornelius, 473 U.S. at 806, 105 S.Ct. 3439.
In Travis, the Second Circuit addressed the applicable criteria, finding that in a limited public forum "constitutional protection is afforded only to expressive activity of a genre similar to those the government has admitted to the limited forum." 927 F.2d at 692 (citing Calash 788 F.2d at 82). Amplifying this language, the Court of Appeals declared that in a limited forum "the government is free to impose a blanket exclusion on certain speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." Id. In a recent decision quoting and further expanding on this statement, the Circuit Court asserted that "for those who seek to speak on a topic or in a manner not contemplated by the public entity in opening the limited forum `there is no fundamental right of freedom of speech'." Good News Club, 202 F.3d 502 (quoting Bronx Household, 127 F.3d at 217) (emphasis added). In an earlier application of these principles, the Circuit Court found reasonable the distinctions drawn by the City in excluding a privately-sponsored rock concert from a public sports arena where access was limited to civic, charitable, and non-profit groups. See Calash, 788 F.2d at 84.
Here, PETA argues that its rejected cow design represented a form of expression permitted within the scope of the forum and was not different from others approved, including PETA's other entry. The City and CowParade Organizers, on the other hand, contend that the rejected PETA cow design was not of the same genre as those allowed. The City and CowParade Organizers argue in effect that PETA's second cow design was excluded because it contained expression of a type or in a manner not contemplated by the government in creating the exhibit. In support of their decision, defendants point to the rejection of the three other cow designs they found to be similarly inconsistent with the Guidelines and the CowParade Organizers' purposes; to their willingness to accept those portions of PETA's *326 design deemed acceptable; to accommodate PETA if it altered that design to conform to the Guidelines as applied; and to their acceptance of the one PETA design determined to comply with the standards.
In evaluating the government's action in order to gauge whether it satisfied the applicable standards of reasonableness, the Court considers two distinct approaches. The Court, consistent with PETA's theory, could focus narrowly on the content of each of the three rejected statements and assess the reasonableness of their exclusion according to whether any of them  separately or collectively  appears to be "like" the other six statements on the same design that the government indicated was unobjectionable, or like the message conveyed by the accepted PETA cow design, or like any comparable expression allowed on any other cow design included in the exhibit. Alternatively, the Court could assess reasonableness as manifested by defendants' action as to PETA in the aggregate, concentrating not so much on a finetuned, word-for-word parsing of the verbal calibrations of distinctions among each of the three rejected statements contrasted with those deemed acceptable, but on how the City and the CowParade Organizers dealt with PETA's design as a whole in relation both to the application of Guidelines and to their treatment of other participants.
Although arguably either approach could yield the same result in this case, taking into account all the permissible circumstances that allow reasonable exclusions of access to expressive activity in a limited forum such as that found here, in this Court's view the second approach is more appropriate. The Court believes that whether taken as a whole or individually, the expressions on the three panels of PETA's cow design that were rejected support the City's and CowParade Organizers' contention that these statements convey PETA's message in a manner not consistent with the concept and purposes of the exhibit the government contemplated in creating the limited forum for the CowParade. The Court acknowledges that the distinctions are subtle, imprecise, hard to articulate as to each excluded word. They necessarily demand calibrated line-drawing choices on which reasonable people may differ. But precisely therein lies the difficulty with this approach. It would require the government to justify each exclusion in minute detail. It carries the likely peril of inserting the Court into the minutiae of uniquely subjective government value judgments, in that enterprise potentially supplanting the functions of executive branch officials, second-guessing them and substituting a judge's own subjective impression for that of the government administrators on matters eminently suited to reasonable differences of opinion among reasonable people. Necessarily it also may require having to brand with damning terms like "arbitrary", "capricious", "invidious" or "irrational" administrative choices favoring one word or phrase over another in a realm occupied by twilit matters of degree, which viewed in a larger sphere may appear demonstrably reasonable.
While in appropriate circumstances a microscopic level of scrutiny and exacting justification conceivably may be demanded under a heightened standard of judicial review, it seems unwarranted under the reasonable test applicable here. In this regard, it bears recalling the Supreme Court's admonition in Cornelius that the object of the inquiry in evaluating government actions to exclude access to expressive activity in a nonpublic forum is to find only a reasonable decision, and "it need not be the most reasonable or the only reasonable limitation." 473 U.S. at 808, 105 S.Ct. 3439. As the Court also noted in Perry, distinctions that may be impermissible in a public forum are "inherent and inescapable" in the process of limiting activities in a nonpublic forum to those compatible with the intended purpose of the property. 460 U.S. at 49, 103 S.Ct. 948.
The Supreme Court's public forum doctrine suggests a jurisprudential principle *327 instinct with basic guidance that instructs by implication, no less than by actual rulings and results. As this Court reads the message, it is that within the confines of state property not open to the public at large the government may choose to provide some public access for expressive activities. When it does so, the government's judgments in drawing distinctions to limit such access consistent with the purposes of the forum and the nature of the property should be accorded judicial deference so long as, upon independent judicial review, it demonstrates that the limitation falls within the range of reasonable discretion the government requires in managing its internal affairs, and to the degree the restriction does not otherwise unduly burden free expression. In this context, that lower level of judicial oversight and justifiable deference may itself constitute a component of the overall mix of balanced public governance, and may become an accessory component of what forms reasonableness under "all of the surrounding circumstances". See Cornelius, 473 U.S. at 809, 105 S.Ct. 3439.
There is a necessary corollary of this principle. It is that a reviewing court's authority to declare an action of the state unconstitutional ranks among the most extraordinary powers our system of government entrusts to the judiciary, one that should inspire some justifiable trepidation in the hardiest of judicial minds whenever it is summoned to be invoked. The depth of this trust, the potency of the responsibility and the reach of its effects all demand delicate judgment to discern when the proper moment prevails to exercise that far-reaching authority. These concerns also counsel prudence and restraint and scrupulous attention to the inherent perils, so as to ascertain that when the occasion does arise it is fully justified by a compelling record. This Court has not found the present record sufficiently compelling to warrant the application of that extraordinary judicial remedy to overturn the government's action here as unconstitutional.
The second alternative open to this Court, that of testing the reasonableness of the government's action here by the aggregate of its treatment of PETA's designs, obviates the pitfalls and flaws inherent in the first approach, and, in this Court's view, may better conform with the principles and framework of the Supreme Court's public forum doctrine as understood by this Court. Here, the Court finds that the actions of the City and CowParade Organizers in administering the forum's Guidelines generally, and in specifically applying them to PETA, fall well within the purposes of the relevant forum and the scope of permissible government latitude and discretion, rendering the City's decision overall to be reasonable and entitling it to deference. In following this course and reaching this conclusion, the Court weighed a number of the particular circumstances present here that are encompassed within the framework of those the Supreme Court and the Second Circuit have considered relevant and persuasive to the determination of reasonableness in other public forum cases.
To gauge the reasonableness of the City's exclusion of PETA's second design, this Court first assessed, in light of the record, the fairness and objectivity of the application of the restriction specifically to PETA. On this score, the Court took into account a number of facts cited by the parties. While the City and the CowParade Organizers arguably could have exercised discretion to reject both of PETA's designs as inconsistent with the Guidelines, they chose to accept one cow as fully complying with the rules. In the view of this Court, this choice was one on which reasonable people could have differed. Yet, PETA's first design and portions of the second were accepted as complying with the Guidelines.
Second, as regards the rejected cow design, the Committee's objection did not apply to the entire submission, but only to the text on three of nine panels and to PETA's corporate logo on a fourth. *328 Though the entire design could have been excluded, the City and CowParade Organizers expressed willingness to accept the entry with the six approved panels, or to allow PETA to modify the design or to alter the objectionable text so as to remove the language the Committee found in conflict with the Guidelines and the purposes of the exhibit. Third, in drawing the very subtle distinctions between the portions it found acceptable and those not, the Committee evinced an objection not to the speaker or to the substance of the message, but to the mode of delivery  the language they perceived as being abrasive, evocative and running counter to the festive, whimsical and humorous designs sought by the promoters and conformed with by all other sponsors. Fourth, the Court finds that the genre of expression contained in the portions of the PETA exhibit that were rejected, measured by the total impression and effect it portrays, is reasonably comparable to the same qualities conveyed by the three other cow designs that the Committee denied. Overall, the impression the Committee's actions reveal seems more consistent with an intent not to exclude but to accommodate PETA, in what seem like good faith efforts to apply the Guidelines even-handedly, perhaps precisely out of concern to avoid potential free speech issues. The action does not manifest an arbitrary, capricious or invidious scheme to bar PETA or PETA's point of view from the CowParade.
On the limited record here, the Court is unable to make a supportable finding that any of the cows the City and CowParade Organizers accepted raises objections comparable to those upon which PETA's second cow design was not accepted. The City and CowParade Organizers introduced photographs of a large number of cow designs which they allege provide a representative sample of all entries and illustrate both the understanding by other participants of the purposes of the event and the fair and consistent application of the Guidelines by the Committee. PETA, on the other hand, offered photographs of two cows which it asserts could be perceived as not consistent with uniform adherence to the regulations. The Court did not find PETA's limited examples persuasive, or to represent a sufficient sampling to support an inference that the Committee acted arbitrarily in applying its standards.

3. Forum Purposes and Public Interests

The Court has weighed the reasonableness of the limitation on access to expressive activities in light of the declared purposes of the forum and the necessity to reserve the limited public forum to expressive activities compatible with the use of the property. See Cornelius, 473 U.S. at 809, 105 S.Ct. 3439. This inquiry suggests a consideration of the relevant "use", the relevant "property" and the relevant "public" for which the government has opened state property for limited expressive purposes. See Cornelius, 473 U.S. at 802, 105 S.Ct. 3439; Perry, 460 U.S. at 45, 103 S.Ct. 948; Bratton, 95 F.3d at 230.
In this connection, this Court notes that, as one of the surrounding circumstances uniquely prevalent here the CowParade is the product of a public-private partnership entailing investment of significant capital in the venture by a private entity. This form of private involvement in the financing of public functions has become an increasingly pervasive and significant means of underwriting projects and events in which the general public has an important interest and from which the state derives substantial benefits. This is true especially in the context of dwindling public resources available for certain activities for which the government may be reluctant to exercise its powers to tax the entire citizenry.
Thus, the private entities which participate in such joint ventures with the state become critical members of the "public" whose particular interests must be given special weight in any evaluation of the rules and management pertaining to the public-private enterprise. In this context, *329 the private entities' interest in the commercial success of the venture in accordance with the regulations adopted for its management takes heightened importance and must be considered along with the interests of the government and weighed against the interests of the persons whose access to public expression may be somewhat curtailed by the limitations imposed in connection with the partnership's enterprise.
In the case at hand, the Court must note that the CowParade Organizers must have expended significant resources to recruit sponsors and artists, to manufacture and have decorated the 500 fiberglass cows, and to transport, assemble and maintain them at the designated locations throughout the City. These structures constitute an integral part of the property at issue here. Ownership of them is retained by the CowParade Organizers, whose investment could not be intended entirely as a charitable contribution to the City and its people. Rather, the CowParade Organizers undoubtedly seek to recoup their organization's financial commitment from the fees charged to the sponsors, from the sale of associated merchandise and from the public auction of the exhibit's cows at the end of the event.
For its part, the City seeks to gain financially not only indirectly from the revenues attracted by any enhanced tourism and related private spending, but also from the minimum payment it is guaranteed from the proceeds of the auction, which funds are to be dedicated for improvement of the City's parks. Thus, for these public and private commercial ends to be served, the unique property here at issue is not dedicated to or compatible with conveyance of every message designed on it. Potentially some forms of expression may be inconsistent with the exhibit's purposes or with the ownership interests and the expectations of the City and CowParade Organizers.
In the manner and to the degree described above, the City and the CowParade Organizers, and by extension the larger general public which also stands to benefit economically and otherwise from the event, all share an interest in maximizing the success of the activity. Reasonable limitations governing the exhibit are therefore critical to ensure that unrestricted access does not unduly interfere with the achievement of the partnership's goals or jeopardize the event altogether. An exclusion of political, sexual or religious subjects and terms purposely evocative of controversy  in the context of a guideline that the exhibit is intended to be appropriate to a broad-based audience of all ages, and of an explicit desire by the City and the CowParade Organizers to avoid controversy and potential disruption  to this Court does not appear an unreasonable imposition. Some of these concerns rank precisely among the considerations the Supreme Court found persuasive in a number of the cases in which restrictions of a similar nature on access to expressive activities were upheld. See Kokinda, 497 U.S. at 736, 110 S.Ct. 3115; Cornelius, 473 U.S. at 809, 105 S.Ct. 3439; Perry, 460 U.S. at 51, 103 S.Ct. 948; Heffron, 452 U.S. at 650-51, 101 S.Ct. 2559. See also Lehman, 418 U.S. at 304, 94 S.Ct. 2714 ("Revenue earned from long-term commercial advertising could be jeopardized by a requirement that short-term candidacy or issue-oriented advertisements be displayed on car cards."); Lebron, 69 F.3d at 657 (Amtrak's position as a government entity used daily by thousands of people "made it highly advisable to avoid criticism and the embarrassments of allowing any display seeking to favor any political view.").
The City and the CowParade Organizers could reasonably anticipate, as the City's argument suggests (see City Memo at 12), that opening unlimited participation to a city-wide art exhibition of the kind here, in a city encompassing the diversity of cultures, beliefs and profound sensibilities endemic to New York's society, could be an invitation for the failure of the event. It is entirely foreseeable that such an open format would produce, not the *330 festive, decorous and celebratory art exhibit here envisioned and actually occurring, but a massive public billboard which would display, along with much worthy art and creativity, a multitude of political axes and grinding stones, obscenities and self-advertising. Such entries, demanding delicate political and practical choices of what expression to allow and what to exclude, would confront government officials with far more severe First Amendment dilemmas than those posed here. Placed on public spaces, objectionable works inevitably would become lightning rods for controversy or even violence. How long would a sculpture constituting quasi-public property and painted with swastikas, or hooded with the robes of the Ku Klux Klan or depicting explicit pornography, remain at any public corner of the City before being vandalized? See, e.g., East Timor, 71 F.Supp.2d at 340 (a street sign placed near the Cuban Mission to the United Nations in New York naming the intersection "Brothers to the Rescue Corner" caused "intense disputes, including demonstrations, counter demonstrations, protests, and at least one attempt to paint over the sign to erase its message.").
Were the art exhibit to turn into such a carnival and maelstrom of public protest, the capital investment expended by its proponents to produce it would be imperiled, as would be the reasonable expectations of the government and the CowParade Organizers of generating the revenues necessary to fulfill some of the other primary purposes they contemplated for the event. There can be little doubt that some cow designs expressing language or messages that reasonably could be regarded as offensive would be likely to command less value at the auction after the event. See Kokinda, 497 U.S. at 735, 110 S.Ct. 3115 ("The [Postal] Service's concern about losing customers because of the potentially unpleasant situation created by solicitation does not per se reveal an effort to suppress expression...."); Cornelius, 473 U.S. at 809-10, 105 S.Ct. 3439 (the "rejection of the Government's interest in avoiding controversy that would disrupt the work place and adversely affect the Campaign is inconsistent with our prior cases."); Lehman, 418 U.S. at 304, 94 S.Ct. 2714 ("In these circumstances, the managerial decision to limit car card space to innocuous and less controversial commercial and service oriented advertising does not rise to the dignity of a First Amendment violation.").
Another aspect of public interests that the Court weighed is a concern, alluded to in the City's argument, of the general public whom the government, through the exclusion here, sought to protect from the assault of a potentially offensive, unwanted message affixed by authority of the City itself, to structures occupying public spaces and open to view by all audiences, day in and day out for almost three months. The three expressions at issue here do not represent those composed of fleeting words which, having been spoken, disperse in the wind along with the listeners who may hear them and move on. Rather, their impact would be much more enduring. The messages would be addressed to an audience subjected to the visual and written effect of the potentially offensive expression. To the extent that people cannot avoid encountering these cows in the course of their daily business, the cows present the possibility that some visitors may consider themselves a captive audience, unable to avoid their messages even if they wished. This concern would be especially apt in regards to the CowParade sculptures placed in enclosed lobbies, atriums or concourses, and most particularly those in spaces privately owned. The captive audience consideration is a factor which the Supreme Court has regarded as relevant to be weighed in the evaluation of the reasonableness of a government restriction affecting freedom of speech in limited or nonpublic forums. See Packer Corp. v. Utah, 285 U.S. 105, 52 S.Ct. 273, 76 L.Ed. 643 (1932). See also Lehman, 418 U.S. at 304, 94 S.Ct. 2714 ("The City consciously has limited access to its transit system advertising space in order to minimize chances of abuse, the *331 appearance of favoritism, and the risk of imposing upon a captive audience.").
A further dimension of the public interests the Court considered in this limited forum context, one reflecting a concern for fairness and equal protection, is the interest of other participants granted access to the event. Grouped in this class are both those who availed themselves of permitted access in compliance with the Guidelines, and those who may have expressed their designs in a manner different from what they might have produced had the Guidelines allowed the latitude PETA seeks for itself, as well as those who may not have entered at all, deterred by good faith adherence to a face value understanding of what was to be regarded as impermissible expression for the purposes of the exhibit. As to those who did participate, a failure by the City and the CowParade Organizers to adhere to or enforce the rules, potentially converting the exhibit into an event materially different from that which its purposes contemplated and also possibly risking the success of the event, could diminish the investment or expectations such participants paid for.
In Heffron, 452 U.S. 640, 101 S.Ct. 2559, the Supreme Court considered a concern of this nature a valid interest to be weighed in excluding certain forms of expression from a limited public forum. The Court observed that declaring invalid, as applied to one particular religious organization, an access restriction to a state fair that barred open solicitation except from rented booths, would render the exclusion equally invalid with respect to other organizations that did rent booths and confined their activities to those locations. See id. The Court added: "Nor would it be valid with respect to other organizations that did not rent booths, either because they were unavailable due to a lack of space or because they chose to avoid the expense involved, but that would in all probability appear in the fairgrounds to distribute, sell, and solicit if they could freely do so." Id. at 653, 101 S.Ct. 2559.

4. Alternate Channels of Communication

Against these various dimensions of forum purposes and public interests, this Court weighed the effect of the limitation here at issue on protected First Amendment values, on the interests of that portion of the public that may be interested in hearing PETA's message, and on the degree of interference occasioned to PETA and to the general public by the challenged exclusion of access to expression. As a point of departure for this inquiry, the Court notes that the rejection of PETA's design on portions of one cow does not in any way implicate or interfere with PETA's ability to carry out its mission. PETA's expression is already being conveyed in part through its one design in the CowParade. With or without another cow in the City's limited exhibit, or with or without any other sculpture PETA may choose to produce on its own  including one containing the exact design and content of the exhibit denied access here  PETA is free to express its entire message to the same, or to a larger audience, at any public forum park, street, sidewalk or other public space in the City.
In fact, PETA is entirely at liberty, through peaceful means consistent with public safety and welfare concerns, to organize its own public forum of one. If, incident to expressing its message, PETA requires placing a sculpture or structure indefinitely on traditional public forum property, it may seek a City permit, a denial of which would be subject to strict First Amendment scrutiny. From that exclusive platform, it could advocate and proselytize fully, using every available means of communication, even in front of every one of the more than 500 cows sponsored in the exhibit, and even if the content of its message may offend the sensibilities of some or all members of the public. See Hill v. Colorado, ___ U.S. ___, ___, 120 S.Ct. 2480, 2489, 147 L.Ed.2d 597 (2000); Erznoznik v. City of *332 Jacksonville, 422 U.S. 205, 210-11, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); Cantwell v. Connecticut, 310 U.S. 296, 308-09, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).
To this extent, the CowParade's limitation, applicable to only three of PETA's nine proposed messages, does not burden speech any more than necessary. It imposes only a reasonable level of interference on robust national freedom of speech values that the state should protect, foster and tolerate to the maximum degree consistent with the management of government internal operations. Nor does the restriction, in relation to the achievement of the purposes for which the government intended to limit the forum here, infringe on the right of that segment of the public interested in hearing PETA's message, or on PETA's own First Amendment rights.

5. Promotion of First Amendment Values

Finally, this Court's analysis of forum purposes and public interests is mindful of another consideration already alluded to above. Giving effect to the government's purposes contemplated in opening selective access to particular nonpublic properties for expressive activities promotes our national commitment to vigorous free speech interests. As the Supreme Court observed in Forbes, the government is thereby encouraged "to open its property to some expressive activity in cases where, if faced with an all-or-nothing-choice, it might not open the property at all." 523 U.S. at 680, 118 S.Ct. 1633. The Court there evinced a concern with placing the government, when considering whether to open public property for expression, in a quandary between the prospect of "cacophony" on the one hand, and First Amendment liability on the other, in which event it might decide that the safer course may be to avoid controversy, and by so doing "diminish the free flow of information and ideas" Id. at 681 (quoting Turner Broad. Sys., Inc. v. Federal Communications Comm'n, 512 U.S. 622, 656, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)). The Court concluded that "[a] First Amendment jurisprudence yielding these results does not promote speech but represses it." Id.

6. Proprietary Capacity

PETA contends that the City acted as a regulator when it determined that PETA's cow design was inappropriate for the exhibit and that therefore the state action here should be subject to stricter scrutiny. The Court disagrees. The state action here in limiting expressive activities was in fact taken in the course of the City's conducting a proprietary function seeking to achieve various legitimate objectives that, as described by the City and the CowParade Organizers, go beyond expressive activities. The stated goals of the exhibit combined artistic expression with commercialism, boosterism, civic pride and public celebration. These are all legitimate ends for a municipality to pursue. See Young v. American Mini Theatres, Inc., 427 U.S. 50, 71, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) ("The City's interest in attempting to preserve [or improve] the quality of urban life is one that must be accorded high respect."); Berman v. Parker, 348 U.S. 26, 32-33, 75 S.Ct. 98, 99 L.Ed. 27 (1954) ("The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary.").
To achieve the broad range of the exhibit's purposes, the CowParade Organizers required, and the City granted, a permit authorizing an ordinarily impermissible use of public spaces. In this manner, the City was doing nothing more than managing the use of its public resources. The City was not attempting to exercise legislative or regulatory functions to enact or enforce rules of general application. Nor was a limitation on speech rights of the general public per se the underlying motivation of the City's action in issuing the CowParade Permit. The government here did not aim to establish generally applicable norms of conduct, to promulgate values or to curtail general debate. Instead, its purpose fell within the large scope of legitimate *333 public governance for which the state requires reasonable latitude. It bears recalling the Supreme Court's observation in Cornelius that the "[g]overnment, as an employer, must have wide discretion and control over the management of its personnel and internal affairs." 473 U.S. at 805, 105 S.Ct. 3439 (quoting Arnett v. Kennedy, 416 U.S. 134, 168, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J., concurring in part)). This consideration not only provides a basis for a determination that the reasonableness standard applies, but may in itself provide a measure of the manner and means the government chooses to exercise its managerial authority.
Accordingly, for all of the reasons described above, this Court concludes that, in the context of the purposes of the nonpublic or limited forum determined here, the action by the City and CowParade Organizers in excluding a portion of PETA's second cow design was reasonable.

VIEWPOINT NEUTRAL
To survive First Amendment scrutiny, an exclusion of access to expressive activity from a nonpublic forum must be not only reasonable but also viewpoint-neutral. See Cornelius, 473 U.S. at 806, 105 S.Ct. 3439 (citing Perry, 460 U.S. at 49, 103 S.Ct. 948). PETA claims that the exclusion of the three panels of its cow design which the Committee found objectionable constitutes impermissible discrimination on the basis of viewpoint. PETA contends that the Committee's finding PETA's design controversial represented an expression of the government's attitude towards PETA's viewpoint in the public debate over the consumption of meat.
Some of the considerations the Supreme Court has identified as pertinent to a determination of viewpoint-neutral government restriction on speech include whether (1) the regulation is within the constitutional power of the government; (2) the restriction furthers an important or substantial governmental interest; (3) the government interest is unrelated to the suppression of free speech; and (4) the incidental restriction on First Amendment rights is no greater than necessary to foster that legitimate interest. See United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).
In a number of its public forum cases, the Supreme Court has elaborated on these standards. Cornelius made it clear that "the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." 473 U.S. at 806, 105 S.Ct. 3439. Even in a nonpublic forum, a governmental restriction on expression must "not [be] an effort to suppress expression merely because public officials oppose the speaker's view." Perry, 460 U.S. at 46, 103 S.Ct. 948. In Rosenberger, the Court sought to articulate more clearly the distinction between content-based exclusion, which may be permissible in a limited public forum such as the CowParade, and impermissible viewpoint-based exclusion:
[I]n determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations.
515 U.S. at 830. And in Taxpayers for Vincent, 466 U.S. at 804, 104 S.Ct. 2118, the Court stated that "[t]he general principle ... is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." See Lamb's Chapel, 508 U.S. 384, 113 S.Ct. 2141.
Under these criteria, to establish that the Committee's decision constituted an impermissible viewpoint-based exclusion, PETA must demonstrate that the three rejected panels would have been "includable" under the Guidelines but were excluded *334 because the government was motivated by hostility to PETA's anti-meat/pro-animal-rights views or sought to favor some other perspective.
On the record before the Court, PETA has shown no substantial likelihood of prevailing on this claim. The Court has not seen a convincing demonstration that the Committee was impelled by impermissible motive to disfavor PETA's animal rights message. To the contrary, the evidence weighs preponderantly in the other direction. First, the Committee indicated that six of the panels which contained the same general idea as the three found objectionable, although in allegedly less abrasive language, would have been approved. See Chass Aff. at ¶ 8. For example, the statements indicating that meat eaters are more prone to heart disease and excessive weight were deemed acceptable under the Guidelines. These messages, which powerfully evoke the audience's fear of disease and death and play on anxieties about excessive weight, seem no less anti-meat than the rhetorical force palpable in the rejected assertion that "eating meat causes impotence". Second, the Committee accepted PETA's first cow design, which contained an unequivocal pro-animal rights message exhorting the audience to "buy fake for the COW'S sake". Despite what arguably might be regarded as a political advocacy statement, the Committee accepted this design because it considered the cow's decoration otherwise whimsical, festive and humorous in a manner consistent with the exhibit's contemplated purposes. This distinction seems to confirm that what motivated the Committee was more its conception of the overall intent of the CowParade than the substantive perspective of the cow sponsors.
Third, the CowParade Organizers granted PETA a waiver to allow PETA to obtain the proceeds of the sale of its cows after the exhibit. Fourth, for the reasons already discussed above, the Committee reasonably found that the content of the excluded panels was inconsistent with the Guidelines and the stated purposes of the event and that the design was rejected not so much for its perspective as for the manner in which the message was delivered. Accordingly, the restriction on PETA's expression cannot be deemed directed against expression otherwise included within the limitations. Fifth, PETA contends that the Committee, while finding PETA's anti-meat message controversial, approved a number of cow designs that actually promote a pro-meat-eating message. The evidence PETA offers to support this argument, however, is sparse and speculative and does not persuasively demonstrate that the designs in question were in fact admitted under a motivation to favor a pro-meat ideology. Moreover, even if the Committee had been prompted by a predisposition to favor a pro-meat perspective in the few exhibits PETA refers to, PETA does not explain how that by itself establishes discrimination when the Committee also offered to accept a modified, but still manifestly viewpointdriven design from PETA, in addition to PETA's other pro-animals rights messageladen design the Committee did approve.
It is beyond dispute that "[t]he right to free speech ... includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speaker's message may be offensive to his audience." Hill, ___ U.S. ___, ___, 120 S.Ct. 2480, 2489, 147 L.Ed.2d 597.[13] However, on this record, although the Committee deemed three PETA cow design statements more objectionable than the others, PETA has not shown that the messages were rejected because of the viewpoint they impart or that other designs the Committee did accept deliberately advance the perspective PETA's mission seeks to counter.
*335 Conceivably, at a trial, PETA might produce evidence more indicative of hostility towards its anti-meat message than the rejection of the three panels the Committee found objectionable. But the allegations before the Court at present are insufficiently weighty to demonstrate a substantial likelihood that PETA will ultimately prevail on this issue.

SUMMARY
In summary, the facts before the Court do not indicate that the CowParade restriction the City adopted and applied is viewpoint-based or unreasonable, either in terms of the government interest promoted by it or in terms of its application. The Court further finds that PETA's ability to express its message, while limited within the CowParade forum, is not unreasonably foreclosed by the City's excluding a portion of PETA's proposed design from the exhibit, and that ample alternatives exist for PETA to convey its full message to the same or a larger audience. Based on these considerations, the Court does not believe that PETA has met the requisite substantial likelihood of success on the merits. In making these findings, the Court is mindful that what it is called to rule upon in connection with a request for a preliminary injunction is not an actual determination of the merits or a full assessment of the weight or credibility of the evidence presented in favor of or in opposition to the motion. Rather, the Court's review produces only a forecast of the likelihood of success that is necessarily based on the limited record available at the time of the petition.

DEGREE OF HARM
For an injunction that is mandatory or will provide the movant with substantially all the relief sought, the balance of harms test per se is inapplicable because such an injunction should not issue absent a showing of clear likelihood of success on the merits or of "extreme or very serious damage" that will result from a denial of the requested preliminary injunction. See Tom Doherty, 60 F.3d at 34. Rather than merely assessing in whose favor the balance tips, the Court applies a higher standard in considering the extent of harm PETA may suffer absent an injunction in order to ascertain whether such harm is severe enough to warrant an injunction even absent a showing of substantial likelihood of success on the merits.
The Court does not doubt that PETA's interests would be furthered by being allowed to participate in the CowParade. PETA seeks a highly visible place for its expression, and it may be that a cowrelated exhibit is particularly appropriate for PETA's animal rights message. The CowParade has a brief duration but high visibility. As each day of the CowParade exhibit passes, PETA loses the opportunity to display its message through the event to hundreds or thousands of new people. Were PETA found to be constitutionally entitled to such a benefit, the exclusion would constitute a major harm. However, the Court also notes that, as discussed above, PETA is not prevented from publicizing its message widely in any number of other comparable ways, so that the CowParade limitation is less of a hardship than if PETA's expression were being entirely restricted in a traditional public forum. Although a regulation of expression represents a serious harm by its very nature, and the harm cannot be fully compensated monetarily, the fact of such a limitation cannot, by itself, automatically tip the balance in favor of the party restricted. Absent the establishment of a constitutional right to have its message displayed in this particular manner and forum, the harm PETA suffers by virtue of the exclusion of a portion of its message is relatively minor.

NEW YORK CONSTITUTION
The New York Constitution's free speech provision, while occasionally considered to be broader than the First Amendment of the United States Constitution, has in like contexts been found to be subject to very similar standards. Article 1, § 8 reads: "[e]very citizen may freely *336 speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." N.Y. Const., Art. I, § 8. The language is thus somewhat broader than that of the First Amendment. However, New York state courts apply a forum analysis, along with the concomitant standards, similar to the doctrine formulated by the Supreme Court to govern First Amendment cases. See, e.g., Rogers v. New York City Transit Auth., 89 N.Y.2d 692, 657 N.Y.S.2d 871, 680 N.E.2d 142, 147 (1997)(citing Kokinda and Lee for the proposition that subway stations were "limited public forums subject to reasonable regulation"); Byrne v. Long Island State Park Comm'n, 66 Misc.2d 1070, 323 N.Y.S.2d 442 (N.Y.Sup.1971) (where forum is nonpublic, the reasonableness test is the applicable standard whether the rule is a content based regulation on speech or an incidental restriction on expressive activity).
Furthermore, even where the forum analysis for the First Amendment has not been applied directly to the New York Constitution, courts have referred to the reasoning of federal courts that expressive activities are protected where not inconsistent with the general nature and use of the property. See, e.g., Rogers, 657 N.Y.S.2d 871, 680 N.E.2d at 147. Even though New York courts are clear that the State is particularly disposed toward avoiding restrictions on free expression, they do not indicate that prior restraints in nonpublic forums are subject to higher standards than under the First Amendment.[14] Because the New York State Constitution's free speech provision is subject to the same general inquiry concerning the appropriateness of particular expressive activities associated with particular forums that the Court here has applied in deciding PETA's First Amendment claim, PETA also cannot establish a likelihood of the success on the merits of its claim under the State provision.

THE CONTRACT CLAIM
In light of this Court's conclusion that PETA has not demonstrated a substantial likelihood to prevail on the merits of its constitutional claims, it is unnecessary to consider whether PETA is entitled to injunctive relief ordering specific performance of its agreement with the CowParade. Whatever contractual right PETA may have to exhibit, the rejected cow design is integrally connected to the legitimate authority of the CowParade Organizers to enforce the provision of the agreement with PETA that allows them to exclude from the exhibit a design found not to comply with the Guidelines. If PETA is unable to succeed in its constitutional challenge of that authority, its contractual argument for specific performance similarly fails.

CONCLUSION AND ORDER
For the reasons set forth above, it is hereby
ORDERED that PETA's motion for a preliminary injunction is denied; and it is further
*337 ORDERED that the parties are directed to appear at a conference with the Court on July 28, 2000 at 9:30 a.m.
SO ORDERED.

EXHIBIT A
 *338

*339 EXHIBIT B

NOTES
[1] See Bartlett's Familiar Quotations, 270 (Justin Kaplan, ed., 16th ed. 1992) ("I have made this letter longer than usual because I lack the time to make it short.") See also Henry David Thoreau Letter to Mr. B dated Nov. 16, 1857 in id., 270 n. 2 ("Not that the story need be long, but it will take a long while to make it short.").
[2] NYC 2000 is the Mayor's committee appointed to oversee millennial celebrations in New York City. See City Defendants' Declaration in Opposition to Plaintiff's Motion for a Preliminary Injunction, sworn to June 22, 2000 ("City Decl."), Ex. A.
[3] Of the approximately 500 cow sculptures accepted in the exhibit, approximately 366 of them were allowed to be placed on sidewalks, parks and other open spaces that are public properties of the City. See City Decl., Ex. B at ¶ 1. The balance are located in atriums, lobbies, plazas and concourses within buildings in private ownership or controlled by other governmental entities. See id., Ex. K; Gifford Decl., Ex. F.
[4] CowParade Worldwide assigned the Permit to CowParade New York 2000, Inc. and is not a party to this action. See City Decl., Ex. B.
[5] Although PETA claims that it was only after being informed of the Committee's decision that it was provided with a written copy of the Guidelines the Committee was charged with applying, the facts before the Court indicate that PETA likely knew the nature and content of the Guidelines prior to being informed of the rejection of its cow. Curt Curtis, the principal contact between CowParade Holdings Corp. and PETA, averred that he had provided and discussed the Guidelines with PETA, particularly after a prominent art association, the New York Foundation for the Arts, withdrew from involvement in the CowParade because of restrictions in the Guidelines. See Affidavit of Curt Curtis, submitted by the CowParade Organizers, sworn to on or about June 21, 2000 ("Curtis Aff."), at ¶¶ 8, 9.
[6] A copy of the design at issue before the Court is attached to this Opinion as Exhibit A. A copy of the approved design is attached to this Opinion as Exhibit B.
[7] In addition to PETA's submission here at issue, the three other designs rejected were: "Moni-Cow Lewinsky," a caricature of Monica Lewinsky, disapproved as a "gratuitous personal attack;" a cow dressed to resemble a Hasidic Jew viewed as potentially "offensive or demeaning to Hasidic Jewry;" and a cow with a rubber "stamp of approval" deemed a political attack against the Mayor. Slarskey Aff. at ¶ 17.
[8] Citing Heffron and Perry, Justice Blackmun's dissenting opinion in Cornelius expressed his agreement with the Court that the government "may create a `forum by designation' (or, to use the term our cases have adopted, a `limited public forum')." Cornelius, 473 U.S. at 813, 105 S.Ct. 3439 (Blackmun, J., dissenting).
[9] The Second Circuit is not alone in citing confusion as to the distinctions drawn between a designated forum and a limited public forum. Various other courts have noted the apparent inconsistencies and ambiguities in the use of the "limited public forum." See, e.g., Whiteland Woods, L.P. v. Township of West Whiteland, 193 F.3d 177, 182 (3d Cir. 1999); Summum v. Callaghan, 130 F.3d 906, 913 (10th Cir.1997); Cook v. Baca, 95 F.Supp.2d 1215, 1220 n. 7 (D.N.M.2000); Scroggins v. City of Topeka, 2 F.Supp.2d 1362, 1370 n. 5 (D.Kan.1998).
[10] See East Timor v. City of New York, 71 F.Supp.2d 334, 342 (S.D.N.Y.1999), where Judge Sweet, quoting from the "mixed signals" the Circuit Court had referred to in Bratton, noted: "While the Circuit does not always apply its own distinctions between `designated' and `limited' public fora [citations omitted] the distinctions correctly identify an unresolved ambiguity in the Supreme Court's jurisprudence." The District Court there determined that the City's temporary street sign program was a limited public forum and applied strict scrutiny to review the exclusion of the applicant and the reasonableness test to evaluate viewpoint neutrality. See id.
[11] Most of the balance of the cow sculptures are located in open spaces such as plazas, arcades and atriums that are situated on the property of private owners or other units of government. An interesting conceptual issue, not addressed here, arises as to the status, for public forum analysis purposes, of privately owned sculptures placed in spaces located entirely within privately owned properties. In that event, the City is not contributing government property for forum purposes, although it remains as a co-host of the event. Whether ownership of the private property would nonetheless be attributable to the government for forum analysis is an open issue.
[12] Given alternative forums for expression, historical preservation interests have been found to allow the government to restrict aesthetic-related features such as size and color as well as to ensure adherence to vague standards such as "architectural and historical appropriateness" Mayes v. Dallas, 747 F.2d 323 (5th Cir.1984); "prohibiting eyesores" Maher, 516 F.2d 1051; and adhering to "official tradition" and "quaint and distinctive character". Burke v. City of Charleston, 893 F.Supp. 589 (D.S.C.1995) (upholding the prohibition of a "mode of delivery" of protected speech for art using bright palette that failed to conform to the standard camouflage pattern exemplifying Charleston's "official tradition") vacated on other grounds, 139 F.3d 401 (4th Cir.1998). See also Gold Coast Publications, Inc. v. Corrigan, 42 F.3d 1336 (11th Cir.1994) (upholding uniform color and size restrictions of news racks). Governmental interests in historical preservation have been defined broadly by courts. In Burke, as well as in Globe, the court allowed a ban on news racks in a historic district, on the grounds that it destroyed historical authenticity by causing visual clutter and being "unsightly." See Burke, 893 F.Supp. 589. The Globe court found that the ban at issue concerned aesthetics and was unrelated to the suppression of particular ideas, as "street furniture" can alter "visual clutter in different ways," and the news racks were not only "unique", but "unsightly" and caused "visual clutter," all of which warranted differential treatment from other street furniture. See Globe, 100 F.3d at 185. In Burke, the court found content-neutral the barring of a house with bright colors that went against the historical "camouflage" theme, and that such an eyesore would not only be sentimentally offensive on historical preservation grounds, but would hurt the town commercially. See Burke, 893 F.Supp. 589.

These courts have agreed that creating specificity in regulations protecting such interests can also be difficult. The ordinance at issue in Burke listed as grounds for considering a design inappropriate, such subjective factors as "multiplicity and incongruity of details resulting in a restless and disturbing appearance, and an absence of unity and coherence not in consonance with the character of the existing structure or the neighborhood." Id. at 612. The Burke court acknowledged that it was not necessary for the guidelines specifying the grounds for denial of a permit to exhaust every possibility to withstand facial challenge. See id. The Maher court, noting the difficulty of "capturing the atmosphere of a region through a set of regulations", found that despite having "no officially promulgated regulations [to] pinpoint each decision," it was not vague to call for protection and control over the "quaint and distinctive character [and the] architectural and historical value". Id. at 1062. See also Mayes, 747 F.2d 323 (upholding regulation that structures be "architecturally and historically appropriate" and that their "manner ... be compatible and [in] harmon[y] with the existing structures").
[13] It is important to note that the forum at issue in Hill, which dealt with a statutory restriction on political activism on public streets, was a traditional public forum, not a limited public forum. See Hill, ___ U.S. ___, ___, 120 S.Ct. 2480, 147 L.Ed.2d 597.
[14] In Bellanca v. New York State Liquor Auth., 54 N.Y.2d 228, 445 N.Y.S.2d 87, 429 N.E.2d 765 (1981), the New York Court of Appeals found that, while a ban against topless dancing might be permissible under the United States Constitution based on the effect of the Twenty-First Amendment on the First Amendment, it was not permissible under Section 8 of Article 1 of the New York State Constitution. In so holding, the Court noted that, while not defining the standard to be applied to determine whether a regulation violated Article I, § 8 of the New York State Constitution, it considered that the test would likely be more than that of mere rational relationship to a government interest and would depend on the nature of the speech conduct to be regulated. See id. at 769 n. 8. Even if this case involving the constitutionality of a particular regulation were analogous, which this Court believes it is not, this Court has found no case suggesting that something more than a rational relationship need be found in a nonpublic forum. Further, the nature of the conduct here restricted  participation in a selective-access exhibition  lends support to the legitimacy of restrictions being placed on it.